**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.: 19 CR 980** |
| **vs.** | ) | |
| | ) | |
| **HAITAO XIANG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**POST-HEARING BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Now comes the defendant, Haitao Xiang, by and through his undersigned attorney, and respectfully submits this post-hearing brief in support of his motion to suppress evidence obtained through violation of his Fourth Amendment rights:

## I.   PRELIMINARY STATEMENT

The FBI attempted to work around the protections of the Fourth Amendment by employing the services of the CBP in what was nothing more than a fishing expedition into Mr. Xiang – an individual for whom they, admittedly, did not have the requisite probable cause to obtain a warrant.  The border search of Mr. Xiang's devices did not become legitimate simply because FBI/CBP Task Force Officer ("TFO") Beck took off his FBI hat and put on his "CBP hat" when he requested that the devices be detained. Transcript of Proceedings, May 17, 2021 ("Tr."), pg. 125.  The government claims this is true, and that the FBI was assisting the CBP, even though TFO Beck's role at the time was to "provide assistance to the other agency

participants," Tr., pg. 93, and he physically worked in the FBI's St. Louis office. Tr., pg. 14. This cannot be true.

The hearing in this matter has made it abundantly clear that the FBI was never actually assisting the CBP—it was the other way around. This court cannot be hoodwinked by the government's disingenuous claims that the CBP needed assistance when they never even bothered to *attempt* to search the devices. Tr., pgs. 58, 113. Instead, the testimony clearly showed that SA Depke went to TFO Beck for assistance when he did not have his own search authority. And the devices were given to him to further his own pre-existing investigation into general, ordinary criminal wrongdoing.

And the unreasonable manner in which this search was conducted clearly demonstrates that this was never a true border search. The CBP officers repeatedly violated their own directive and did not even have the authority to send it to the FBI by their own standards. They offer no real excuse for these failures and assert nothing but after-the-fact fabrications. This resulted in Mr. Xiang being completely deprived of his possessory rights and having his electronic devices subjected to one of the most invasive search methods. Nor is there a valid excuse for SA Depke's failure to obtain a warrant. Instead of doing so, he kept the devices under the border search authority and completely disregarded CBP's own imitations in the process.

What is more, the officers did not even have a reasonable suspicion that Mr. Xiang was currently engaged in criminal activity or that his devices contained evidence of such. Nearly all the facts SA Depke relied upon came from Monsanto, a

biased and uncorroborated source.  And the information Monsanto provided did not point to any current wrongdoing.  It consisted entirely of past conduct, often occurring years before the search.  None of it indicated that Monsanto documents or proprietary information had been downloaded to Mr. Xiang's devices. Tr., pg. 74.  There was no evidence that he downloaded anything from his work computer or that anything was missing from it. Tr., pg. 74.  In fact, the government failed to produce any evidence that the agents knew Mr. Xiang's devices existed, let alone that they contained evidence.

This court cannot sanction such law enforcement action and set a dangerous precedent expanding the reach of the border search doctrine.  Never has a pre-textual border search used solely to further an existing investigation into ordinary criminal activity been allowed, particularly one in such blatant violation of all governing sources of authority.  And this court cannot do so here.  This is not a case about proper border searches.  Instead, this is a case about law enforcement exploiting a narrow warrant exception and recklessly subverting the Fourth Amendment, eviscerating Mr. Xiang's constitutional guarantees in the process.

## II.  ARGUMENT

A warrant was required for this forensic border search that occurred on Mr. Xiang's electronic devises.  Although the government claimed for the first time at the hearing that this was a national security matter, it was not.  Regardless, the fact that something may be a nation security matter does not suspend the protections of the Fourth Amendment.  Further, there was no reasonable suspicion to that Mr. Xiang was currently engaging in criminal activity or that the devices contained evidence of

such.  The officers were acting on a mere uncorroborated hunch from Monsanto, based on long past events and wholly innocent conduct.  Finally, the search was conducted in an unreasonable manner and violated CBP's own directive.  For each of these Fourth Amendment violations, the evidence must be suppressed

## A. THIS WAS NOT A NATIONAL SECURITY INVESTIGATION NOR DOES THE FOURTH AMENDMENT VANISH IN CASES OF "NATIONAL SECURITY"

To begin, the search and seizure of Mr. Xiang's devices required a warrant. Mr. Xiang has briefed his position extensively in his prior motion and reply and will not now belabor this point[1].  In short, this search was untethered from the underlying justifications of the border search exception, and his possessory interests and immense privacy interest in the devices vastly outweigh the government's minimal interest in detecting mere digital evidence of a trade secrets offense.

At the suppression hearing, the government appeared to take the position that this was a national security issue.  It was not.  National security entails "[t]he safety of a country and its governmental secrets, together with the strength of its military, seen as being necessary to the protection of its citizens." *National Security*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Monsanto's trade secrets are not government secrets—it is a for-profit company, not a government agency.

Nor did the testimony presented at the hearing support that this was a legitimate national security investigation, especially during the time period between when the investigation was opened and when the forensic search occurred.  SA Depke

---

[1] Mr. Xiang respectfully adopts and reincorporates all legal and factual assertions made in his previous filing on this subject.  R. 93, 106.

testified that this opened as a national security investigation on June 5, 2017 because he was part of the "National Security Squad." Tr., pg. 68.  Yet, he was not assigned this case.  Instead, it was Anne Luther from Monsanto's security team contacted him about Mr. Xiang. Tr., pg. 7.  It cannot be that every case that he receives a tip on is a national security matter simply because he is part of the "Squad."

Even more to the point, SA Depke testified it would "become[] a national security matter" if the trade secrets "were obtained on behalf of the Chinese government." Tr., pg.  67.  Yet, SA Depke did not learn of any connection to the Chinese Hundred Talents Program ("HTP") until long after the devices were forensically searched. Tr., pg. 68; R. 93-1, ¶ 27.  Nor did he testify that there was any other connection to the Chinese government aside from the HTP.  True, he did testify that on June 5th Monsanto told him that Mr. Xiang allegedly sent, without specifying when and what, "packets of information" to Nercita, a Chinese *company*. Tr., pg.  8. But a Chinese company is not the Chinese government.  It does not create the necessary link to transform an ordinary trade secrets offense into economic espionage or a national security matter.  And SA Depke did not even learn that Mr. Xiang was a Chinese national until June 7th and learned of his travel plans even after that. Tr., pg. 11.  So, when it was supposedly opened as a national security matter, SA Depke did not have any connection to the Chinese government or know that there was even a Chinese national involved at all.

To deem it a national security matter at the point  of the investigation, SA Depke's claim would mean he and Monsanto made a seemingly nefarious inference

that because Mr. Xing was Chinese and accused of trade secrets offense, he must have been stealing them on behalf of the Chinese government.  This kind of stereotype cannot be tolerated; the government cannot be allowed to benefit from expanded national security powers by relying on these kinds of improper inferences.[2]  These perceived prejudices were corroborated at the hearing when the government offered into evidence flight records of another presumably Chinese individual on Mr. Xiang's flight out of O'Hare.  The undersigned's bewilderment must have been apparent when questioning SA Depke about the reason or for the inclusion of this record as an exhibit at the hearing.  See, Tr., pgs. 56-57.

Nonetheless, it has long been decided that the "Fourth Amendment freedoms cannot properly be guaranteed if [national] security" actions, such as conducting warrantless searches in the name of national security, are "conducted solely within the discretion of the Executive Branch." *United States v. U.S. Dist. Court for E. Dist. of Mich., S., Div.* ("*Keith*"), 407 U.S. 297, 316-17 (1972).  In *Keith*, the Supreme Court decline to exempt searches done for national security investigations from the warrant requirement, even in a case involving the bombing of a CIA building. *Id.* at 317-20. Like in *Kieth*, the officers and prosecutors here are "not the sole judges of when to utilize constitutionally sensitive means in pursuing" a national security matter. *Id.* at 317.

Invasive forensic searches of digital devices conducted as border searches have never been sanctioned by the Supreme Court or the Eighth Circuit.  A forensic search

---

[2] None of SA Depke's reports list this investigation as a national security matter.

6

undoubtedly constitutes a search under the Fourth Amendment.  Even if the officers believed there was evidence of a national security matter, the Supreme "Court has never sustained a search" on the grounds "that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." *Id.* at 317.  Accordingly, this forensic search, untethered from the border exception and outweighed by Mr. Xiang's privacy interests, is not saved by the possibility that it might have invoked national security.

### B. EVEN IF THIS COURT DOES NOT REQUIRE A WARRANT, THE EVIDENCE MUST STILL BE SUPPRESSED BECAUSE THERE WAS NO REASONABLE SUSPICION OF CURRENT CRIMINAL ACTIVITY OR THAT EVIDENCE WOULD BE FOUND ON THE DEVICES

As discussed in Mr. Xiang's prior filings, at a minimum, a reasonable suspicion was required to conduct a non-routine forensic border search of electronic devices. *See, e.g.*, *United States v. Montoya de Hernandez*, 473 U.S. 531, 534-36 (1985); *United States v. Cano*, 934 F.3d 1002, 1021 (9th Cir. 2019); *United States v. Aigekaen*, 943 F.3d 713, 721 (4th Cir. 2019); *United States v. Williams*, 942 F.3d 1187, 1190-91 (10th Cir. 2019).[3]  The government did not point to any objective and particularized facts that Mr. Xiang was engaged in any criminal activity nor that there was evidence of criminal wrongdoing on his devices.  SA Depke relied entirely on information from Monsanto and took them at their word, never corroborating the information before the search.  Even without considering the biased nature of the information, it still consisted of nothing more than dated, past events and wholly innocent conduct that

---

[3] In addition, when devices are sent for subject matter assistance even the CBP directive indicates there should be a reasonable suspicion as the section is entitled "Subject Matter Assistance by Other Federal Agencies – With Reasonable Suspicion."

could be applied to a large population of individuals—insufficient to form a reasonable suspicion.  Stripped to its core, the agents here were acting on nothing more than a hunch that it got from Monsanto.  It does not pass constitutional muster.

In essence, all that SA Depke relied on, aside from Mr. Xiang's travel plans, came from Monsanto, primarily Ms. Luther. *See* Tr., pgs.  8-9, 12-13, 20-28.  On June 5th, Ms. Luther informed SA Depke that Mr. Xiang was a Senior Research Engineer for The Climate Corporation ("TCC"), he resigned from TCC, he previously sent work emails to his personal email, he made "suspicious" Google searches one to two years prior, he sent "packets of information" to Nercita—which even Ms. Luther did not know whether or not he was permitted to do so—and he had worked on the same team as Jiunnren Chen at TCC. Tr., pg. 8-11; *see* also Exhibit A. Three days later, Ms. Luther informed him that Mr. Xiang "came to Monsanto's knowledge based on a 2008 incident" involving Spectir and that he was leaving to work for a startup, Ag-Sensus, with his former PhD advisor. Tr., pgs. 12-13.  Finally, after the June 9th exit interview, Monsanto told SA Depke that Mr. Xiang appeared nervous and "deceptive." Tr., pgs. 20-28.  The only independent information SA Depke and TFO Beck learned was that Mr. Xiang was a Chinese national that booked a one-way trip to China to visit his parents. Tr., pgs. 11, 17.  None of this, alone or in conjunction, leads to the conclusion that Mr. Xiang was currently involved in criminal activity, nor that the devices contained any evidence of wrongdoing.

*First*, a large portion of the information consists of nothing more than innocent conduct that applies to a large portion of the population and factors little, if at all,

into the reasonable suspicion. *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) ("The officer's reasonable suspicion cannot be, however, just a mere hunch or based on circumstance which 'describe a large category of presumable innocent [people].'") (citing *Reid v. Georgia*, 448 U.S.438, 441 (1980)); *United States v. O'Neal*, 17 F.3d 239, 242 (8th Cir. 1994) (stating "conduct typical of a broad category of innocent people provides a weak basis for suspicion."). The circumstances of his employment, his resignation, his trip to China, and his relationship with Chen is precisely the type of wholly innocent conduct that does not factor into the analysis. True, Mr. Xiang was a research scientist that resigned from TCC. And yes, he planned to work at a startup after his departure. But if this supports a reasonable suspicion of wrongdoing, then there is reasonable suspicion anytime an employee at a science or tech firm quits their job for another opportunity. It is not a crime to resign. And, importantly, neither SA Depke nor TFO Beck had any information that Mr. Xiang was lying about his reasons for departing TCC or his new startup opportunity, nor did he hide those facts. Tr., pgs. 62, 111.

Despite the agents repeated emphasis on the relationship between Mr. Xiang and Chen, they fail to give any reasons why Chen's alleged wrongdoing somehow implicates Mr. Xiang in any criminal activity whatsoever. SA Depke stated that Monsanto informed him that Mr. Xiang had "significant communication" with Chen. Tr. 9. Yet, Monsanto merely told him that Chen was Mr. Xiang's coworker and that they worked on the same team. Tr., pg. 11. It would be suspicious if they had not communicated.

SA Depke then testified that he had no information that Mr. Xiang was involved with Chen's wrongdoing, no information that they ever communicated about stealing propriety information, and no information on the contents of the communication. Tr., pg. 69-70.   There was not testimony or evidence that they communicated outside of the workplace.   Even SA Depke agreed that Chen's unlawful conduct did not mean Mr. Xiang was going to break the law. Tr., pg. 70.   The testimony presented nothing more than a normal work relationship, the same type of relationship millions of Americans have.   One is not suspicious for their coworker's misdeeds.

Another completely innocent fact was Mr. Xiang's trip to China.   The government attempts to use the officer's "background" knowledge of the HTP, and, as TFO Beck calls it, a "trend" of Chinese trade secrets offenses to somehow paint his trip as nefarious. Tr. 45, 109-10.   This smacks of the same type of profiling both the Supreme Court and Eighth Circuit have repeatedly denounced. *See Reid*, 448 U.S. at 441 (finding that the defendant fit a "drug courier profile" along with nervous behavior did not establish a reasonable suspicion of wrongdoing, as inferring criminal activity from such evidence reflected no more than an "inchoate and unparticularized suspicion or hunch."); *O'Neal*, 17 F.3d at 242, n.5 (finding that profiles "ha[ve] little meaning independent of the objective facts.").   It treats China, the most populated country and one of the travelled to locations, like the unfavored "source cities" of narcotics offenses instead of pointing to objective, specific facts. *Reid*, 448 U.S. at 440-41; *United States v. Johnson*, 171 F.3d 601, 605 (8th Cir. 1999) (finding that the

10

"source state" known for narcotics had insufficient value "as an articulable basis for reasonable suspicion" because it was heavily populated and traveled to). Nor does the one-way ticket matter, as it is not indicative in itself and has repeatedly found insufficient even in conjunction with other factors. *See United States v. Eustaquio*, 198 F.3d 1068, 1071-72 (8th Cir. 1999) (finding insufficient reasonable suspicion of a stop based in part on defendant's same day purchase of a one-way ticket in cash).

Mr. Xiang booked a trip to visit his parents in China—his home country—and he booked it one way because he was using airline miles. Tr., pgs. 110-11. That is what he told the officers during the secondary inspection. *Id*. Neither TFO Beck nor SA Depke had any information to show that he was lying about this or being deceitful. Tr., pg. 62, 111. He gave responses consistent with what he had said during his exit interview. And the fact he was travelling without his family is not indicative anything. The officers made no inquiries into why he was travelling alone. In fact, it evidences an intent of Mr. Xiang to return to his family in the United States, detracting from the notion that he was fleeing to China.

*Second*, the information does not indicate any present wrongdoing or that the devices contained evidence of wrongdoing. The officers needed a reasonable suspicion that Mr. Xiang was *currently* engaged in criminal activity *at the time* the border search occurred. *See, e.g.*, *Brown v. Texas*, 443 U.S. 47, 51 (1979); *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Jones*, 269 F.3d at 927 (requiring reasonable suspicion "that a crime is being committed."); *United States v. Black*, 104 F. Supp. 3d 997, 999-1003 (W.D. Mo. 2015) (suppressing evidence obtained from a vehicle that was observed leaving a

drug dealing location multiple times in the days prior to the stop because there was no "reasonable suspicion that the car and occupants were involved in criminal activity *at or near the time* of the stop.") (emphasis added).  What is more, the officers needed a reasonable suspicion that the devices themselves contained evidence of criminal activity. *See United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) (finding that a frisk search unjustified because the suspicious circumstances "add[ed] nothing" to whether there was reasonable suspicion the defendant was possessed a firearm); *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (requiring a "particularized and objective basis for suspecting that the package contained contraband.").  The 2008 Spectir incident, the emails to his personal account, the "suspicious" Google searches, and the "packets of information" to Nercita, are all dated events that do not indicate Mr. Xiang was currently engaged in criminal activity nor that his devices contained evidence of wrongdoing.

All these events occurred well before the border search—at least two of them occurred years before.  Even to Monsanto, the 2008 Spectir incident was so unimportant that it continued to employ Mr. Xiang for nearly a decade afterwards. This long-ago incident has no bearing on Mr. Xiang's current activities.  In a similar way, the emails to his personal account also shed no light on any current wrongdoing. Ms. Luther did not tell SA Depke when the alleged emails were sent, but it was before Monsanto's initial contact with SA Depke. Tr., pg. 8. SA Depke did not see the emails before conducting the forensic search; he was not told what the sensitive information was, how many emails were involved, when it was sent, or whether it was sent by

accident or deleted. Tr., pgs. 54-55.  Again, he relied entirely upon Monsanto for this information and did not even attempt to corroborate it before the search. Tr., pg. 54. He had no information that Mr. Xiang downloaded the emails to his devices or even when he would have done so. Tr., pg. 74.  Without any of this knowledge, the emails shed no light on whether Mr. Xiang was currently engaged in criminal activity nor that such evidence would be found on his devices.

Likewise, the "suspicious" Google searches occurred in 2015 and 2016, with the latest occurring about a year before Mr. Xiang put in his two-week notice. Tr., pg. 53. SA Depke did not event see a copy of the Google searches before conducting the forensic search. On cross-examination, SA Depke repeatedly testified that he did not receive the Google results until after the search, recalling that it occurred after important events in the investigation. *See*, *e.g.*, Tr., pg. 72 ("Q: And the truth is you didn't see [the Google searches] until July 7th, 2017, isn't that true? A: That sounds correct."); Tr., pg. 76 ("Q: And so when you called CBP and then they seized the devices, and then you imaged them, and then you reviewed the images, no law enforcement officer had reviewed any Google searches, correct? A: As of what date? Q: Any time from June 8th until June 20th. A: That's correct, yes.").  In addition, he previous swore in an affidavit, and authored a report, that he received the Google search on July 7th.  R. 93-1, ¶ 27; R. 93-2, Pg. 2.  If it were really a transcription error, he would not have separated events occurring on the same day as happening on two separate dates.  To that point, SA Depke included an index of the evidence gathered during that event, and he does not index the google searches until a reported dated

13

July 7, 2019. *See* Exhibit B.

Even assuming, *arguendo*, that SA Depke did see the Google searches, sporadic Google searches conducted one to two years prior still do not indicate Mr. Xiang was currently engaging in criminal activity at the border nor that the devices had any Monsanto proprietary information on his devices. There were no such Google searches in 2017 or around the time of his resignation. Tr., pg. 53. What Mr. Xiang may have Googled in the past has no bearing, and provides no insight, on what he was doing one to two *years* later. Even if these legally conducted internet searches appeared unusual, that is insufficient. *United States v. $45,000 in U.S. Currency*, 749 F.3d 709, 721 (8th Cir. 2014) ("This Court has several times suppressed evidence obtained as a result of unconstitutional seizures occasioned by officers' suspicion, where such suspicion was based solely on the fact that defendants were engaging in legal activity that merely appeared out of the ordinary."). And these dated searches entirely fail to indicate that that there was anything on the searched electronic devices.

Finally, the "packets of information" sent to Nercita add nothing to the analysis, it is simply a red herring. Ms. Luther did not even know herself what the contents of the packets were or whether Mr. Xiang was permitted to send them. Tr., pg. 9. If it were against Monsanto's policy for Mr. Xiang to even send the "packets," surely Ms. Luther would have told SA Depke, or fired Mr. Xiang. Instead, it is just another piece of information that proves nothing. Simply put, SA Depke did not know what was in the packet, Monsanto never told him. Tr., pg. 54. He did not know if it

14

contained sensitive, confidential, or proprietary information or any trade secrets. Tr.. pg. 54. SA Depke appears to have never been told when this even occurred. This piece of the puzzle, too, fails to indicate at all whether Mr. Xiang was engaged in wrongdoing at the moment or had evidence of such on his devices.

*Third*, the alleged "nervous" exit interview should be disregarded in its entirety as it was not even observed by law enforcement. Tr., pg. 20-22. The Eighth Circuit has repeatedly denounced the value of nervousness in the reasonable suspicion analysis. *See*, *e.g.*, *Jones*, 269 F.3d at 928 ("Generally, however, nervousness is of limited significance in determining reasonable suspicion" and it "must be treated with caution.") (internal quotations omitted). And here, the nervousness was not even observed by trained law enforcement personal, but by Monsanto employees. Tr., pg. 73. SA Depke did not see the exit interview video, hear its audio recording, or read the transcript until well after the border search occurred. Tr., pg. 73. SA Depke relied entirely on Monsanto's conclusory determination that Mr. Xiang was acting nervous, not any specific, objective facts. Tr. 22.

And it must not be forgotten that Monsanto is biased observer. It is clear that Monsanto had already predetermined that Mr. Xiang was guilty of some wrongdoing before the exit interview and was soliciting tips from SA Depke on how to interrogate him before the exit interview, even wanting him to be present. *See* Exhibit A. They apparently were even acting as human lie detectors during the interview, capable of measuring Mr. Xiang's pulse by sight alone. Tr., pg. 22. Put simply, their account is not credible. Their views of Mr. Xiang's reactions were tainted from the start—they

were already coordinating with the FBI to investigate Mr. Xiang and they were going to say he acted nervous regardless of what happened. And with the accusatory nature of the exit interview, any person would have expressed signs of nervousness. *See Jones*, 269 F.3d at 928-29 ("[W]e are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confront[.]") (internal quotation omitted).

At its root, the fundamental flaw in the government's position is that it fails to point to specific, objective facts that Mr. Xiang was engaged in criminal activity at the time of the search or that his devices contained evidence of criminal activity. There was no evidence that anything was downloaded off his work computer or transferred to the devices. Tr., pg. 74. There was no evidence that anything was missing from work computer. Tr., pg. 75. There was no evidence that Monsanto's documents, propriety information, trade secrets or other sensitive information were on the devices. Tr. 74. And there was no evidence that the agents even knew the devices existed before the search, let alone that they contained evidence of wrongdoing. Instead, Monsanto had a hunch—based on years-old conduct and completely innocent behavior—that Mr. Xiang might have been engaged in criminal activity like another Chinese ex-employee of theirs. And SA Depke agrees that he "just believed what" they told him, Tr., pg. 76, and even began coordinating the border search when "no law enforcement had personal" knowledge of the facts. Tr., pg. 77. In sum, Monsanto's hunch cannot justify this invasive search by government agents.

### C. SUPPRESSION IS ALSO REQUIRED BECAUSE THE PRETEXTUAL BORDER SEARCH WAS UNREASONABLE AND VIOLATED CBP'S POLICY

The testimony during the suppression hearing made it abundantly clear: this was an FBI investigation and the CBP was used to merely seize the devices so that the FBI could search them for its own purposes. The CBP was assisting the FBI, not *vice versa*. SA Depke's own words encapsulates this best. After receiving an email stating that CBP had seized the devices and were shipping them to him in St. Louis, he replied, "thank you for your assistance[.]" Tr., pgs. 60-61; Gov. Ex. 5. The CBP was never in real need of assistance, how could they be when they never even attempted to search the devices. Tr., pgs. 58, 113. Nor did they actually care about the results. What is more, the way this border search was conducted repeatedly violated CBP's directive and SA Depke fails to offer a valid reason for why he did not obtain a warrant. Put simply, this pretextual search was unreasonably conducted.

When SA Depke first met with TFO Beck on June 8th, he knew he "did not have the authority" to seize and search the devices on his own. Tr., pg. 61. Even with the information Monsanto provided him, he admitted did not have probable cause for the devices. And so he met with TFO Beck who physically worked in FBI St. Louis's office (Tr., pg. 14) and discussed the possibility of a secondary inspection, which included detaining Mr. Xiang's electronic devices. Tr., pg. 49-50. This was before even learning of the planned trip to China. Tr., pg. 49. TFO Beck, however, has a blurred role according to him: he is part FBI, part CBP. Tr., pg. 111. He works for both the FBI and CBP at the same time, calling himself an officer and agent of both. *Id*. His role, working within the FBI's office, is to "provide assistance to the other agency

participants." Tr., pg. 93.

TFO Beck then informs SA Depke about the possibility of conducting a secondary inspection, including detaining the devices. Tr., pgs. 19, 99.  He asks SA Depke if this was something he wanted done and SA Depke replied, "it would be interesting to know that, yes." Tr., pg. 51; *see also* Tr. 49 ("Q: And you asked for a possibility of an outbound secondary inspection, correct? A: Yes, after [TFO Beck] had suggested or had brought up that it was an ability that they had. Q: Yeah. But you asked him for it, correct? A: Yes.").  TFO Beck also asked SA Depke if he wanted the devices sent to FBI SL. Tr., pg. 51.  At that time, the CBP did not have an independent investigation regarding Mr. Xiang and TFO Beck's suspicion relied entirely on what SA Depke told him. Tr., pg. 109.  But following their June 8th and 9th meetings, TFO Beck put a "Record Lookout" on Mr. Xiang, to target him for a secondary inspection and border search.  Tr., pg. 99.

The next day, the devices were seized from Mr. Xiang at the O'Hare airport pursuant to the Record Lookout. Tr. 104.  The inspection report states, "[a]t the request of CBP/FBI JTTF St. Louis the electronics were detained[.]" Gov. Ex. 5.  The CBP officers at O'Hare called TFO Beck right after the devices were detained (Tr. 103) and were placed in a cubicle to ship without any attempt to search them. Tr., pg. 58; Gov. Ex. 5.  At TFO Beck's direction (Tr., pg. 59), the devices were then shipped to "FBI St. Louis," addressed to both SA Depke and TFO Beck. Gov. Ex. 5; Tr., pgs. 112-13.

Prior to shipping the devices to FBI St. Louis,  CBP never attempted to search

18

the devices in Chicago. Tr., pg. 46, 58, 113-14.  The inspection report does not state that they needed assistance with technical capabilities, translating languages, or understanding the subject matter. Gov. Ex. 5.  Instead, it was SA Depke that told the CBP officers "thank you for your assistance[.]" *Id*.; Tr. 93.  He said this "because they had assisted" *his* investigation, provided *him* with assistance and help in seizing the devices that *he* could not without a warrant. Tr., pg. 60.  Even TFO Beck agreed that this was SA Depke's investigation. *See* Tr., pg. 95.  And when the devices arrived in St. Louis a few days later, it was SA Depke took possession of them, not TFO Beck never did. Tr., pgs. 37; 112.

SA Depke later took the seized electronic devices to the FBI's CART department to create forensic images of the devices, and when they were imaged, he searched the for evidence for his investigation. Tr., pgs. 38-39.  Neither the images, the results, the documents, the translated files, nor the devices were ever sent back to CBP. Tr., pgs. 80-81, 124.[4]  Sure, he claims to have periodically told TFO Beck about the results but based on TFO Beck's testimony it is unclear how frequent it really was and evident that he did not really care.  For example, he recalls that SA Depke told him that everything was in Mandarin and that it was sent to Monsanto after the translation was finished. Tr.,pg 106.  But this is fundamentally wrong.  SA Depke found six documents he thought contained proprietary information after searching on June 20th and sent them over to Monsanto soon after. Tr., pg. 40.  He

---

[4] SA Depke tried to claim that he did not send the results back because it was a national security investigation, but according to him it was always a nation security investigation.  His whole authority to search was based on assisting the CBP.  He cannot claim he was actually assisting, yet at the same time incapable giving the assistance because of his own investigation.

did not discover the Mandarin files until well after that point nor did he ever wait for translation before sending the documents to Monsanto. R. 93-1, ¶ 35.   Either TFO Beck was not regularly informed, or he cared so little that he cannot remember how this seemingly crucial discovery occurred.

In short, this was a blatant exploitation of a narrow exception to the warrant requirement—not a true border search.   SA Depke knew he did not have the authority to search the devices on the information he had, so he had the CBP seize them for him and then immediately turn them over to him under the false narrative of assistance.   This was nothing more than a regular search to further an FBI investigation of an ordinary general wrongdoing disguised as a border search.   As explained further below, CBP had no actual need of assistance and the purpose of the penal statute cited by the government, 19 U.S.C. § 507, is not meet by these facts. There was not even the authority to send the devices to SA Depke under the directive. Without question, the testimony made clear this was a pretextual border search that was inconsistent with the purpose of border searches, CBP's directive, and § 507.

In addition to being a pretextual border search, the search was conducted in an unreasonable manner and repeatedly violated CBP's directive.   To begin, there is no indication that the actual border search was documented in the CBP system, violating § 5.1.3. Tr., pg. 115-16.  Nor was the search was not conducted in front of Mr. Xiang. Tr., pg. 117. TFO Beck claims this was because it was a national security matter, yet he also claims repeatedly throughout his testimony that he was not present in Chicago and unsure about what they did. *See* Tr., pg. 113 ("A:…I don't

know what happened in Chicago.").  He also claims the whole directive is based on national security concerns (Tr. 101), which would make that section meaningless as officers are then always acting on national security concerns.  Instead, the plain reading of the section is that the officers needed a specific reason why having Mr. Xiang present would be a threat to national security.  There was no reason.

Even more egregious is the disregard for the time requirements and lack of supervisor approval for the lengthy extension.  The directive mandates that if the devices are detained after a person leaves, the search must be done as expeditiously as possible and should not exceed five days. Gov. Ex. 5, § 5.3.1.  Detentions past that period required approval from a Port Director or Patrol Agent, and the Director of Field Operations or Chief Patrol Agent must approve detentions past fifteen days. § 5.3.1.1.  These requirements are also imposed on federal agencies assisting a border search, and, importantly, extensions are only allowed in increments of seven days. § 5.3.3.2.  The devices were seized on June 10th and SA Depke keep possession of them under the border search authority until he got a warrant on July 27th. Tr., pgs. 41; 79.  No documentation evidencing any extensions have been produced.  True, SA Depke vaguely remembered TFO Beck mentioning an extension past five days. Tr., pg. 65.  But TFO Beck is not sure whether there was approval and stated there may have been "an email." Tr., pg. 119.  Even if true, there must have been much more than one email; extensions are only given in seven-day increments and SA Depke keep the devices for well over a month.  There is a simple explanation for these inconsistencies and lack of production: the approved extensions never happened.

The most blatant violation, however, is the pure fabrication of the reasons why CBP needed assistance.  SA Depke and TFO Beck claimed the devices were sent down for subject matter assistance with understanding Monsanto's proprietary information and to translate files.[5]  Tr., pgs. 63, 105.  The directive mandates, however, that the devices only be transferred to another agency when "necessary," § 5.3.2.5, and requires that the CBP agents to first encounter the information before requesting either technical or subject matter assistance. § 5.3.2.2-.3.  Even TFO Beck admitted it would be inappropriate under the directive to act otherwise. Tr., pg. 122.  CBP never attempted to search the devices, nor was there any indication they lacked the technical abilities. Tr., pg. 46, 113.  They did not know there would be Monsanto documents on the electronic devices. Tr., pg. 47.  They did not know that there would be proprietary information on them. *Id*.  They did not know that there would be Mandarin files on them. *Id*.  They had no idea what, if anything, would be on the devices. Tr., pg. 46.  SA Depke believes he was the first agent to review the devices, 10 days after they were seized. Tr., pgs. 45-46.  Without attempting to search or encountering the information, the agents had no authority to send the devices to FBI SL.  It should have never occurred.

These reckless violations matter and evidence the true nature of this search. The directive's purpose and its underlying policy is to "protect the rights of

---

[5] The government has also failed to produce documentation stating that these are the reasons the devices were sent to Saint Louis, and the inspection report provides no justification.  Since SA Depke claims to have played no part in CBP Chicago's actions, it is not clear how he knows the reasons. Similarly, TFO Beck repeatedly claimed he did not know what actions CBP took or why they took them.  In all likelihood, these were after-the-fact justifications.  Regardless, they hold no water.

individuals against unreasonable search and seizure and ensure privacy protections[.]" § 2.1.  Even TFO Beck agrees that the Fourth Amendment applies at the border. Tr., pg. 113.  This search was not even reasonably conducted under the CBP's own standards.  The government cannot claim this was a proper border search when they did not even have the authority under the directive itself.  The agents never cared to follow the border search directive, because it was never a true border search.  Instead, it was merely wanted to seize the devices to assist and further the FBI's pre-existing investigation.

This resulted in the violation of Mr. Xiang's constitutional rights as guaranteed by the Fourth Amendment - he was completely stripped of his possessory rights.  Modern law has recognized that Mr. Xiang had an immense privacy interest in the devices, containing enough imminent details of his private life that they rival that of a home.  And those devices were subjected to a forensic search, one of the most intrusive law enforcement procedures that has ever existed.  SA Depke acted without the limits of either a warrant or even the CBP's directive as it was completely disregarded.  And he offered no valid reason for why he waited so long to obtain a warrant.  He vaguely claimed that "it's a process" to go through main DOJ for "counterespionage." Tr., pgs. 68-69.  But, again, there was no indication that the Chinese government had any connection at the time of the forensic search and to infer there would be is to improperly rely on Mr. Xiang's nationality.

Still, "[t]he Fourth Amendment contemplates a prior judicial judgement, not the risk that executive discretion may be reasonably exercised." *Keith*, 407 U.S. at

317.   Mr. Xiang's rights do not hinge on how the DOJ administers its internal procedures.   The Supreme Court has long emphasized the need for obtaining a warrant, even when the initial seizure was justified. *See United States v. Place*, 462 U.S. 696, 708-09 (1983); *Illinois v. Gates*, 462 U.S. 213, 236 (1983). A warrant "is not an inconvenience" to law enforcement, nor is it "weighed against the claims of police efficiency" or the DOJ's internal processes." *Keith*, 407 U.S. at 315 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971)).   Even if it was "is a process," there is no excuse for conducting this search in an unreasonable manner, violating Mr. Xiang's constitutional rights.

## CONCLUSION

This court cannot set the dangerous precedent the government now seeks by this court to expand the border search exception to any law enforcement agency, not just the CBP.   To the government, all the CBP needs to do is seize the devices, and then turn them over to any other agency for them to use in their pre-existing investigations under the guise of "assistance."   Worse, the government wants this action sanctioned even when there is no actual need for assistance, when the CBP does not even attempt to search the devices, when that assistance is never actually given, and when the officers act without authority and intrusively search without regard to any limits or directive.

At its core, this is a case about an FBI agent exploiting a loophole to conduct a forensic search when he knew he did not have enough evidence to get a warrant on his own.  SA Depke received a tip from Monsanto that was composed of nothing but

innocent behavior and alleged events that occurred in the past.  He took no action to corroborate any of the information he was given.  None of it was sufficient to form even a reasonable suspicion that Mr. Xiang was currently engaged in wrongdoing or that his devices contained evidence of such.  It was even a hunch that Mr. Xiang possessed such devices.  And so he met with the FBI/CBP agent working in his office and expressed his interest in having the devices detained after that agent asked *him* if he wanted them detained and sent to him.  This does not then become a proper border search just because TFO Beck then took off the FBI hat and put on his CBP hat when he put in the request.  Particularly when considering that the agents did not even attempt to comply with the directive.  Every aspect of this search wreaks of a Fourth Amendment violation: a warrant was required for this forensic search, there was no sufficient basis for a reasonable suspicion, and it was conducted unreasonably. This Court cannot set this precedent and sanction the trampling of Mr. Xiang's rights. The evidence obtained, therefore, must be suppressed.

Respectfully submitted,

/s/ Vadim A. Glozman
*An Attorney for Haitao Xiang*

Vadim A. Glozman
Matthew P. Kralovec
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 726-9015

Eric M. Selig
Law Office of Eric Selig
222 S. Central Suite 1004
Clayton, MO 63105
Tel: 314-609-3542

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on June 14, 2021, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: all Attorneys of record.

      <u> s/  Vadim A. Glozman   </u>