UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | No.: 19 CR 980 |
| vs. | ) |  |
|  | ) |  |
| HAITAO XIANG, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## DEFENDANT'S OBJECTIONS TO THE UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Now comes the defendant, Haitao Xiang, by and through his undersigned attorney, and respectfully objects to the Report and Recommendation (Doc. 117), which references Mr. Xiang's Motion to Suppress Evidence (ECF No. 93, 106, 114). Mr. Xiang objects to the United States Magistrate Judge's Report and Recommendation that his motion should be denied. As such, Mr. Xiang requests that the Report and Recommendation be reviewed *de novo*. *See* Fed. R. Crim. P. 59(b)(2).

In an effort at brevity and to forgo repetitiveness, Mr. Xiang hereby adopts and reincorporates any and all legal and factual assertions made in his previously filed Motion to Suppress Evidence, his Reply, and his Post-Hearing Brief. The following considerations are merely meant to supplement the assertions he has already made.

In short, the Magistrate Judge made three main legal conclusions and additional factual findings in its Report and Recommendation. The Magistrate Judge found that the forensic search of Mr. Xiang's devices was exempt from the Fourth Amendment's warrant requirement (Doc. 117 at 25), that there was reasonable

suspicion to conduct the non-routine forensic search (*Id*. at 30), and that the search was conducted in a constitutionally reasonable manner (*Id*. at 36). Mr. Xiang objects to all three of these conclusions and to the factual findings supporting those conclusions. Accordingly, this Court should reject the Report and Recommendation's findings and order that the evidence seized from the warrantless forensic search suppressed.

I. **FINDINGS OF THE REPORT AND RECOMMENDATION REGARDING THE FACTUAL DISPUTES THE REQUIREMENT OF A WARRANT**

To begin, the Report and Recommendation incorrectly exempts the forensic search from the Fourth Amendment's warrant requirement and improperly concludes the forensic search at issue falls within the border search exemption. In large part, the Report and Recommendation rejects that *United State v. Riley*, 573 U.S. 373 (2014) has any impact on forensic searches of electronic devices at the border. Doc. 117 at 24-25. To be clear, Mr. Xiang does not argue that *Riley* made a categorical rule prohibiting all warrantless searches of electronic devices. Instead, he asserts that applying the constitutional principles articulated in *Riley*—that warrantless searches untethered from an exception's justifications are unconstitutional—and the Supreme Court's repeated recognition of the immense privacy interests in electronic devices, requires that a warrant had to be obtained before this forensic border search.

The Supreme Court has long held—even before *Riley*—that warrantless searches are unconstitutional if the search was untethered from the exception's underlying justifications. *See Arizona v. Gant*, 556 U.S. 332, 342 (2009). Border searches are merely an exception subject to these same constitutional restraints.

2

*United States v. Ramsey*, 431 U.S. 606, 621 (1977); *United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005). Going in tandem with these constitutional principles is the Supreme Court's recent guidance on how to address the privacy interests at issue in new technologies. *See Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018). Searches of electronic devices and the data they contain are less reasonable than the traditional searches of property because traditional searches are limited in scope by their physical nature. *Id.* at 2219. Courts must also balance "the degree to which it intrudes upon an individual's privacy" with "the degree it is needed for the promotion of legitimate governmental interests" when determining "whether to exempt a given type of search" or a "particular category of effect." *Riley*. 573 at 385-86.

The Report and Recommendation misapplies these constitutional principles and incorrectly weighs the interests at stake. As an initial matter, while the Report and Recommendation cites the conflicting Circuit caselaw addressing this issue, it incorrectly states that no Circuit after *Riley* has required a warrant to conduct forensic border searches. As it does recognize, at least two Circuits have imposed a nexus requirement on forensic border searches. *United States v. Cano*, 934 F.3d 1002, 1021 (9th Cir. 2019); *United States v. Aigbekaen*, 943 F.3d 713, 821 (4th Cir. 2019). But, if these nexus requirements are not satisfied, then those Circuits require a warrant to conduct a forensic border search of electronic devices.

At any rate, as Mx. Xiang explained in his previous filings, recent caselaw has recognized that he had an immense privacy interest in his electronic devices. *United States v. Mays*, 993 F.3d 607, 617 (8th Cir. 2021); *United States v. Cotterman*, 709

3

F.3d 952, 964 (9th Cir. 2013). That interest is so immense that it rivals even that of a home – historically most protected interest. *Riley*, 573 U.S. at 396. Mr. Xiang does acknowledge that the government has a substantial interest at the border. This interest, however, is not boundless and it does not follow that "anything goes." *Cotterman*, 709 F.3d at 960. Importantly, the border search exception is not justified by searching for mere evidence of a crime. *See*, *e.g.*, *Cano*, 934 F.3d at 1017. And the government has a lesser interest in detecting mere digital evidence of a trade secret offense, as digital trade secret offenses are borderless in nature, often occurring over the internet. Mr. Xiang's immense privacy interest in his devices outweighs the government's interest to conduct warrantless and suspicion-less searches for mere evidence of general wrongdoing. Accordingly, a warrant was required.

The Report and Recommendation does recognize that the Circuit conflict addressing this issue and correctly identifies that both the Fourth and Ninth Circuits impose a nexus requirement that must be satisfied before a warrantless forensic search—supported by a reasonable suspicion—can be conducted. Doc. 117 at 16. It further found that, under the facts present here, the Ninth Circuit's more stringent nexus requirement would be satisfied here if adopted. The Report and Recommendation, however, misapplies the nexus requirement. The nexus requires that the search must be for the actual contraband of a crime relating to the border— not for mere evidence. *Cano*, 934 F.3d at 1017. At the evidentiary hearing, the agents admitted that there was no evidence to indicate that Mr. Xiang had downloaded any trade secret or confidential information or that he transferred them to any of his

4

devices. Therefore, the search could not have been conducted to recover actual contraband because there was no basis to believe there would be any actual contraband on the devices.

And further, there was no link to an international crime when the search was conducted. At the time of the search, there was nothing to link Mr. Xiang to any foreign government, let alone he was stealing trade secrets on its behalf. Nor does the Report and Recommendation offer any persuasive authority to suggest that the Customs Border Protection ("CBP") was empowered to enforce trade secret offenses. It fails to cite any statute authorizing CBP to enforce those laws. They merely rely on Officer Beck's testimony that it was a priority. Doc. 117 at 4.

In essence, the Report and Recommendation fails to properly balance the interests at issue and apply the constitutional principles. The border search exception is not justified by a search for mere digital evidence of general wrongdoing, especially one with—at best—a purely speculative link to international crime. And the Report and Recommendation misapplied the nexus requirement. Ergo, this Court must reject its findings on this issue and order the evidence suppressed because the agents failed to obtain a warrant before searching the devices.

## II. FINDINGS OF THE REPORT AND RECOMMENDATION REGARDING WHETHER THERE WAS REASONABLE SUSPICION TO SUPPORT THE NON-ROUTINE BORDER SEARCH

Alternatively, Mr. Xiang asserted that if a warrant was not required, then the evidence must still be suppressed because it was not supported by a reasonable suspicion that Mr. Xiang was then currently engaged in criminal activity or that

5

evidence of such was contained on his devices. The Report and Recommendation correctly recognized that the majority of Circuit courts addressing this border search issue hold that "advanced" or forensic searches constitute non-routine border searches and require a reasonable suspicion. Doc. 117 at 15-17. It then found, without determining whether the search was advanced or a forensic search, that it was supported by a reasonable suspicion that Mr. Xiang was engaged in criminal activity and evidence of that activity would be located on his devices. Doc. 117 at 25-30. The fundamental flaw in its analysis, however, is that it entirely fails to point to any specific facts that could reasonably led the officers to believe that evidence of wrongdoing would be found on his *seized* devices. Neither does it point to any facts that he was *presently* engaged in wrongdoing.

The agents needed a reasonable suspicion that Mr. Xiang was currently engaged in criminal activity *at the time* the border search occurred. *See, e.g., Brown v. Texas*, 443 U.S. 47, 51 (1979); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) (requiring reasonable suspicion "that a crime is being committed."); *United States v. Black*, 104 F. Supp. 3d 997, 999-1003 (W.D. Mo. 2015) (suppressing evidence because there was no "reasonable suspicion that the car and occupants were involved in criminal activity *at or near the time* of the stop") (emphasis added). What is more, the officers needed a reasonable suspicion that the devices themselves contained evidence of criminal activity. *See United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010); *United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (requiring a "particularized and objective basis for suspecting that the package contained

6

contraband."). Importantly, the agents relied on past events, mostly occurring years prior to the search, and almost all of it came from Monsanto, a biased source.

To begin, Mr. Xiang is not engaging in a "divide and conquer" analysis of each fact and circumstance. Instead, he asserts that facts known to the agents at the time of the search do not support a reasonable suspicion—neither alone nor in conjunction. The Report and Recommendation bases its finding on the largely uncorroborated information SA Depke received from Monsanto,[1] mainly from Ms. Luther, his one-way flight to China, and couples these facts with SA Depke's "background" on the Chinese government's ("PRC") Hundred Talents Program. It is insufficient.

The circumstances surrounding Mr. Xiang's resignation and his work relationship with Jiunnren Chen are the type of wholly innocent conduct that adds little, if anything, to the reasonable suspicion analysis. *See Jones*, 269 F.3d at 927 ("The officer's reasonable suspicion cannot be, however, just a mere hunch or based on circumstance which 'describe a large category of presumable innocent [people].' "); *United States v. O'Neal*, 17 F.3d 239, 242 (8th Cir. 1994) (stating "conduct typical of a broad category of innocent people provides a weak basis for suspicion."). Mr. Xiang was a Chinese national whose parents still lived there, and China is one of the most visited locations in the world. The law has repeatedly found one-way trips to even

---

[1] As discussed in his prior filings, Mr. Xiang objects to the Report and Recommendation's finding that SA Depke received a copy of the suspicious Google searches before the border search occurred. As the Report and Recommendation indicates, SA Depke's gave conflicting testimony regarding the date he received the documents, and the exhibits and supporting documents also indicate that he received them after the search. While the Report and Recommendation states that SA Depke corroborated some of the information Monsanto provided him, the only other information that appears to be corroborated were Mr. Xiang's statement that he was leaving Monsanto for a startup, Ag-Sensus and that was planned to visit China after resigning.

7

locations known for certain types of illegal activity insufficient because it is wholly innocent conduct consistent with a large population of the public. *See*, *e.g.*, *O'Neal*, 17 F.3d at 242. At the time, there was nothing to indicate that Mr. Xiang had any connection to the PRC or its Hundred Talents Program. And the Report and Recommendation fails to articulate why Mr. Xiang's relationship with Chen has any nefarious implication at all. It is undisputed that Mr. Xiang worked on Chen's team at Monsanto. It is undisputed that neither the agents nor Monsanto knew the content of their communications or even that they communicated outside of the workplace. There is only one thing this indicates at all: they were coworkers.

Even adding in the past events does not render the sufficient suspicion because it adds nothing to whether Mr. Xiang was currently engaged in wrongdoing or that his devices contained evidence of such. The 2008 Spectir event occurred nearly a decade before the border search, and it was so insignificant to Monsanto that it continued to employee Mr. Xiang for years afterwards. And the suspicious Google searches, corroborated or not, occurred one to two years before the border search—not remotely near the time of the border search. They shed no insight on his current activities. And while the exact date of the "packets of information" being sent to Nercita was never disclosed to SA Depke, it did not occur near the border search. Importantly, not even Monsanto knew whether Mr. Xiang was permitted to send the "packets." It also provides no insight on whether anything was downloaded on his devices or that he was currently engaged in wrongdoing. Similarly, the emails from his work account to his personal account fail to indicate whether there was any

8

evidence of wrongdoing on his devices or his current activities. SA Depke did not see the emails before the search, does not know when they were sent or even if they were set by accident. The Report and Recommendation fails to articulate how considering these unrelated distant events in conjunction indicate *current* wrongdoing or evidence being located specifically on the seized devices. There was no link to any of his devices.

On a related note, Monsanto's uncorroborated claims of generic nervousness during Mr. Xiang's exit interview should not be regarded and the Report and Recommendation misunderstands *Jones*. Monsanto told SA Depke that he was "nervous" and appeared "blatantly deceptive" during the exit interview, "especially" to some more specific questions. Tr. 88. These are generic claims of nervousness—they do not even describe what his actions were. Indeed, in *Jones*, the generic claims of nervousness were the defendant's specific actions while inside the police car. 269 F.3d at 922. The defendant also gave inconsistent answers that indicated "dishonesty" when specially questioned of his past criminal history, similar the Monsanto's claims here. *Id*. at 928. Nor does it matter that Monsanto did the interrogation. The point of *Jones* is that people act nervous when confronted by those in authority. The Monsanto security personnel were in positions of authority and were accusing Mr. Xiang of crimes. It had even consulted SA Depke prior for interrogation tips and wanted him to be present. Anyone would be nervous.

At its core, there was no evidence that Mr. Xiang was currently engaged in wrongdoing or that evidence of such was on his devices. There was no evidence that

9

anything was downloaded off his work computer or transferred to the devices. Tr. 74. No evidence that anything was missing from his work computer. Tr. 75. No evidence that Monsanto's documents, propriety information, trade secrets or other sensitive information were on the devices. Tr. 74. Indeed, there was no testimony that the agents even knew the devices existed before the search. SA Depke's "background" on the Hundred Talents Program does not change the equation in the slightest. It is akin to "drug profiles" that have heavily criticized. *Ried*, 448 U.S. at 441; *O'Neal*, 17 F.3d at 242, n.5. And an officer's training and experience is not a substitute for the individualized, specific facts required for reasonable suspicion. *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994). The Eighth Circuit "has several times suppressed evidence obtained as a result of unconstitutional seizures occasioned by officers' suspicion, where such suspicion was based solely on the fact that defendants were engaging in legal activity that merely appeared out of the ordinary." *United States v. $45,000 in U.S. Currency*, 749 F.3d 709, 721 (8th Cir. 2014).

In short, none of the facts known to the agents at the time indicate any current wrongdoing, and there is even less to show that evidence of such would specifically be located on his devices that were seized. In this case, Monsanto had nothing more than a mere hunch that an employee might have taken confidential information like another ex-Chinese employee of theirs. But Monsanto's hunch does not satisfy the Constitution here. There need to be objective facts constituting reasonable suspicion, and here there were none. Therefore, Mr. Xiang objects to the Report and Recommendation's finding on this issue, and this Court must order suppression of

the evidence derived.

### III. FINDINGS OF THE REPORT AND RECOMMENDATION REGARDING WHETHER THE SEARCH WAS REASONABLY CONDUCTED

Finally, Mr. Xiang argued in the alternative the evidence must be suppressed because it was conducted in a constitutionally unreasonable manner. The Report and Recommendation rejects this argument finding that pretextual border searches are constitutional, the delay in obtaining a warrant was constitutionally reasonable, and that the repeated violations of the CBP's directive did not warrant suppression. Doc. 117 at 30-36. Mr. Xiang objects to these findings. The Report and Recommendation misconstrues Mr. Xiang's argument, particularly regarding the CBP directive, and misapplies its own standard.

To begin, the Report and Recommendation makes various factual findings that Mr. Xiang objects to. It finds that Officer Beck made the decision to detain the devices at the border and that he was acting as a CBP officer as he did so. *See* Doc. 117 at 5, 31. It does not address the fact that Officer Beck was also working as an FBI agent at the time he requested the devices be drained or that he was physically working in the FBI's office in Saint Louis at the time he requested the border search. Tr. 93, 111. Further, it is not credible that SA Depke, a 15-year foreign counterintelligence agent, did not know CBP had the ability to seize devices at the border search before conferring with Officer Beck. It also credits numerous claims of SA Depke regarding the reasons why the devices were sent to Saint Louis for review, but there is no documentary support that SA Depke ever conferred with CBP officers in Chicago regarding these reasons or even communicated with them aside from an email

11

thanking them for their assistance in his investigation. Tr. 60-61. Likewise, it also credits Officer Beck's testimony on this same topic, while he also testified that he did not know what or why the officers took certain actions. Tr. 116. Rather, he stated he "didn't know what happened in Chicago." *Id*. Importantly, none of the documents produced state they were being sent for subject-matter assistance. Instead, they were sent merely because CBP/FBI in Saint Louis requested it. Tr. 121.

Regardless, the Report and Recommendation incorrectly deems pe-textual border searches constitutionally permissible, and it fails to address that this search was conducted outside of an authorization statute. It acknowledges that the FBI was leading the investigation and had the most interest in conducting, seizing, and searching the devices. Yet, it fails to appreciate the CBP's total lack of interest in seizing and searching the devices—it never even bothered to review the results that they supposedly needed assistance understanding. Repeatedly, the Supreme Court has held that warrantless border searches are constitutional because the First Congress that enacted the Fourth Amendment also granted the power to conduct suspicion-less border searches to "customs officials" to enforce customs laws and duties. *See, e.g.*, *United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., concurring); *United States v. Montoya Hernanez*, 473 U.S. 531, 537-38 (1985); *Carroll v. Unites States*, 267 U.S. 132, 150-52 (1925). Therefore, warrantless border searches are only permissible when customs agents are conducting searches to further their own interests—not to further a pre-existing investigation of another agency into general wrongdoing. The Report and Recommendation's reliance on

12

*United States v. Bournelhem*, 339 F.3d 414 (6th Cir. 2003) and *United States v. Levy*, 803 F.3d 120 (2nd Cir. 2015) is misplaced here and they are constitutionally suspect. The CBP here had no interest and played no role in the search aside from seizing the devices, unlike the circumstances in *Bornelhem*, 339 F.3d at 424.

Indeed, the Ninth Circuit has held that the non-customs agents cannot rely on the border search exception, finding the Congress only authorized customs or border patrol agents to conduct such searches. *United States v. Soto*, 598 F.2d 545, 548-50 (9th Cir. 1979). The government contended that the border search was permissible because the CBP, by statute, could "demand assistance." 19 U.S.C. § 507. Yet, despite the government's claim and Mr. Xiang's argument that the search fell outside the statute, the Report and Recommendation fails to address this issue in its entirely. Since warrantless border searches are constitutional because Congress enacted a statute authorizing them, then a search that falls outside of an authorizing statute is not. *See United States v. Harrington*, 681 F.2d 612, 614 (9th Cir. 1982) (noting that border searches are "unusual constitutional dilemma" and confirming that a search is unreasonable when "[a] warrantless border search by an FBI agent for general law-enforcement purposes falls outside" a customs authorization statute).

What is more, the Report and Recommendation misunderstands and misapplies Mr. Xiang's arguments regarding the unreasonable delay and the violations of the CBP's objective. As an initial matter, Mr. Xiang is not arguing that violations of the directive alone dictate that the evidence must be suppressed, and the Rule 41 standard is not implicated here. Doc. 117 at 34. Instead, he argues that

the search was unreasonably conducted, and the repeated and reckless violations of the directive evidence that the search was unreasonable even when judged by the agency's own standards. The violations are substantial, far more than just failing to document supervisor approval. The directive only allows CBP to send seized devices to another agency for subject-matter review when "necessary" and requires agents for first *actually encounter* the information. *See* Tr. 122. Even Officer Beck, who knew the directive, testified that it would be inappropriate to do so otherwise. *Id*. And it is undisputed the CBP in Chicago never made any attempt to search the devices before shipping them to Saint Louis. Tr. 58, 113. SA Depke was not authorized to conduct the keyword searches. Thus, even if the Rule 41 standard applied, Mr. Xiang established prejudice because the search would not have occurred if the agents had followed the directive. *United States v. Skarda*, 845 F.3d 370 (8th Cir. 2016).

Moreover, the two alternative prongs are also satisfied. The prolonged and highly intrusive forensic search, done in repeated violation of CBP's directive, "was of constitutional magnitude" as it was an unreasonable search. *Id*. And Officer Beck was aware the directive existed and made no attempt to follow numerous requirements. Thus, the officers recklessly disregarded the directive, further satisfying the Rule 41 standard. *Id*. These violations matter. Forensic searches are a powerful tool—highly intrusive, exposing more private information than any search before. Law enforcement is restrained by the Fourth Amendment, and it must search reasonably. The law has long held that unreasonably conducted searches are unconstitutional and require suppression. *See, e.g., United States v. Place*, 462 U.S.

696, 708-09 (1983). Failure to follow its own agency's directive implanted to ensure reasonable searches, is evidence they were not doing so.

Nor was the delay in obtaining a warrant reasonable. The Report and Recommendation correctly finds that Mr. Xiang had an immense privacy interest in his devices, and the search was highly invasive. Each keyword searched the entire content of his imaged devices.[2] The month-long delay in obtaining the devices is not excused by the DOJ's internal processes and this was not a complex investigation. Indeed, the Report and Recommendation's basis for this finding is that there was a "potential" that the devices contained complex or foreign material. But what the computer *potentially* contained has no bearing on SA Depke's ability to obtain a warrant. It also improperly justifies the agents' actions to image the devices as a need to preserve integrity. But this is unsupported by the record as there was no testimony that this was a motivating factor or even considered by the agents.

In short, the Report and Recommendation fails to offer a persuasive basis for sanctioning pre-textual border searches and does not address whether SA Depke was authorized to conduct the border search. This search was unreasonably conducted, even judged by the agency's own standard. Therefore, this Court should reject the Report and Recommendation's finding and order suppression of the evidence.

## CONCLUSION

Wherefore, Mr. Xiang makes the foregoing objections and respectfully

---

[2] The Report and Recommendation often uses the keyword searches conducted by SA Depke as its focal point for measuring the search. However, even using software to create a digital image is a search in itself. *See United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017).

15

requests that this honorable Court enter an order suppressing all evidence obtained from this unconstitutional search.

Respectfully submitted,

/s/ Vadim A. Glozman
*Attorney for Haitao Xiang*

Vadim A. Glozman
Matthew P. Kralovec
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 726-9015

## CERTIFICATE OF SERVICE

      I hereby certify that on August 4, 2021, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: all Attorneys of record.

                                                              s/     Vadim A. Glozman