## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 CR 980** |
| **vs.** | ) | |
| | ) | |
| **HAITAO XIANG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S SENTENCING POSITION PAPER

Now comes the defendant, Haitao Xiang, by and through his undersigned attorneys, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), to sentence him to a sentence that equates to time serves. Such a sentencing would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. In support, the following is offered:

### INTRODUCTION

By the time Mr. Xiang comes before this Court for sentencing, he will have spent nearly twenty-nine (29) months locked up within the confines of various jails during an unprecedented pandemic. Not only that, but the two-and-a-half years he has spent locked up have been the only time he has ever been incarcerated. He has spent much of this time reflecting on the decisions he has made leading to his incarceration and the lack of necessity of any of his actions. He has contemplated the effects his ill-advised transgressions had not only on him but on the people closest to him. Lately, more so than ever, his life has been consumed with anxiety, stress, and

anguish as he has waited for his time before this Honorable Court for judgment.  As a man who always prided prioritized his family, Mr. Xiang understands that the actions that brought him before this Honorable Court were not only wrong but ended up costing him much more than he sought to earn from them; he is not only on the verge of losing his liberty, but the ability to take care of his family for the foreseeable future.  To him, this is the worst punishment possible.

Now, Mr. Xiang stands before this Court broken and defeated.  He is extraordinarily humbled and contrite, deeply ashamed and angered with himself; that his actions have not only affected his life, but also the lives of his closest loved ones.  Mr. Xiang has spent the vast majority of his life being a good man, ultimately making a wrong turn. He was always dedicated to education, work, and his family. His life was always consumed in studies and emersed in his work to ensure he could provide for his family the way he always dreamed he would be able to.  And to this day, pride and joy are ever present when Mr. Xiang talks about his family and that is because he truly loves and cares for them.  Being a father has been the biggest blessing of his life. At some point, the pressures he faced from his family in China, coupled with the traumas he experienced as a child, clouded his judgement, and led him astray from the life he has always lived, the life he always wanted to live, and the life he will continue to live after the conclusion of this case.  As he reflects on what he has done, his foolishness and irresponsibility is clearer to him than anyone else.

There is no denying the seriousness of Mr. Xiang's transgressions, and he does not intend on doing so – he was clearly wrong.  Instead, he offers himself to the mercy

of this Court, to take into consideration not only those actions that brought him before this Court, but his personal history and characteristics, the collateral consequences of his actions, and considerations of specific deterrence and just punishment.  In sum, Mr. Xiang respectfully asks this Honorable Court to sentence him to a sentence that equates to time serves; such a sentence would be one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

### SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(A) SUPPORTING A SENTENCE OF TIME-SERVED

This Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to the crime itself.  *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011). After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a).  A sentencing court's inquiry begins by calculating the defendant's advisory Guideline range.  It is undisputed that the total offense level is 12.  PSR § 77.  Coupling that with a criminal history category of I, the advisory sentencing guideline range is 10 to 16 months' imprisonment.  *Id.*

After the Court determines the appropriate guideline calculation, and whether any departures are warranted, it should then consider the factors found in § 3553(a) to determine whether to impose a guideline or non-guideline sentence. *See United States v. Solis-Bermudez*, 501 F.3d, 882, 886 (8th Cir. 2007).  These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law and protect the public, the sentencing range, and the need to avoid unwarranted sentence disparities. *See* 18

U.S.C. § 3553(a). In fashioning his sentence, one that is sufficient but not greater than necessary, Mr. Xiang respectfully asks this Court to consider his personal history and characteristics, the collateral consequences of the instant conviction, sentences of similarly situated defendants, and the lack of need for specific deterrence, among the other § 3553(a) considerations that are outlined below.

## I.   XIANG'S PERSONAL HISTORY AND CHARACTERISTICS

The conduct that has brought Mr. Xiang before this Honorable Court has left those around him dumbfounded as it is at complete odds with his character. "To his family, he is a great father and a lovely husband; to his friends, he is nice, kind and willing to help."[1]  He is "also one of the most hardworking people" they have know, always "dream[ing] to achieve more in his life."[2]  Based on their experiences with Mr. Xiang, it is no surprise that when thinking about how to describe [his] personality traits, the first several adjectives that appear in [their] mind are gentle, kind, and family-centered."[3] Put simply, he is a good man.

Mr. Xiang was born in 1977 in Nanjing, China to Zhen Guan and Sihua Zhao. Growing up in communist China, Mr. Xiang and his family were "extremely poor", as his parents were considered "low level workers." They lived in a small apartment that housed Mr. Xiang, his sister, his parents, and his grandparents.  Having very little income, the family struggled to get food and clothing, leaving Mr. Xiang having to

---

[1] Wenyi Wang letter.
[2] Xinyan Yang letter.
[3] Yue Lu letter.

wear his sister's hand-me-downs because they could not afford to buy him his own clothing.

In addition to the financial difficulties faced by his family, Mr. Xiang had a strict and abusive father who demanded that he and his sister excel at school to be able to help provide for their family financially as soon as they were able to.  If Mr. Xiang ever deviated from his father's control, he would be physically abused.  This got so bad that his sister even attempted suicide= on several occasions because of the abuse.  *See United States v. Germosen*, 473 F. Supp. 2d 221 (D. Mass 2007) (where guideline range was 37-46 months for conspiracy to distribute heroin, a sentence of two years' probation with six months home confinement was warranted partly because defendant had overcome difficult circumstances of his youth where he the defendant was separated from his father and raised by his mother until she moved to Puerto Rico, leaving the defendant behind to be raised by other family members, was physically abused in his home, and was the frequent target of physical abuse in his neighborhood).

Growing up, and heeding his father's demands, Mr. Xiang was a "smart kid."[4] He received good grades, was an honors student, and was awarded as one of the best students in his area. His "whole family was very proud of him because of his academic achievement". [5]  After graduating from high school, Mr. Xiang went on to attend Najing Forestry University. There, he "Was the president of [his class]", "did

---

[4] Hui Xiang letter, pg. 2.
[5] *Id.*

exceptionally well with his school work[.]"[6]

It was in college where he met his wife, Jin.  They knew each other from a few common classes. As Jin remembers"

> I got to know a couple of things about him at the time: Haitao has exceptional talents in academics and he has a big heart. He put in lots of effort and time to help others either to overcome challenges or accomplish more.  I noticed whenever classmates needed help with anything, either daily life problems or academic needs, Haitao always showed up quickly and did what he can to support.[7]

Mr. Xiang started dating Jin when they were both in the Master's program together.  She felt "lucky to have him."[8]  He was "the kindest man in the world."[9] Then, in 2002, Jin was given the opportunity to come to the United States to study at the University of Illinois.  Although Mr. Xiang had been offered an exceptional job after his graduation, he nevertheless resigned and decided to apply for a graduate program in the United States so that he could come here to be with Jin.  He lived on minimum wage and put all of his resources into coming to the United States.  After finally passing his visa interview, Mr. Xiang had "the greatest joy"[10] that he would be able to reunite with his wife.

Mr. Xiang "is a man who puts his family at the very top of his priorities.  [His] close and supportive relationship with his wife is the every of everyone who knows them."[11] And "[s]ince the birth of their daughter in 2008, [Mr. Xiang] has been a loving

---

[6] ZY Kuang letter.
[7] Jin Zhu letter, pg. 1
[8] *Id*., pg. 2.
[9] *Id*.
[10] ZYKuang letter.
[11] Yue Lu letter.

and deeply proud father."[12]  He treats his daughter "as the most precious thing in the world."[13]  Everything that ever needed to get done for his daughter, he would do, whether it be staying up with her at night, taking her to school, taking her to doctor's appointments or extracurricular activities, no matter what, Mr. Xiang did it.  And the same was true with his wife.  There was a time that Jin "had been suffering from dysmenorrhea and [Mr. Xiang] did most of the housework to take care of her" while also taking care of their baby daughter."[14]  He truly "cares deeply about his wife and his daughter"[15] and quickly became "the pillar of his family."[16]

But Mr. Xiang is much more than just a loving husband and an exemplary father; he is also "a very warm-hearted man and always ready to help."[17]  Because of this, he has "earned respect and trust from near all of [his peers] because he always tried to help them as much as he could."[18]  The letters submitted on his behalf tell the story of a dedicated family man, teacher, mentor, community leader, and friend. This was not a character trait they developed later in life, but rather, it was always in his "nature to help people when he can."[19]  A common theme seen through the letters is Mr. Xiang's willingness to assist individuals with even the most mundane tasks, which in hindsight may seem inconsequential but at the time were of immense help to the individual in need.

---

[12] *Id.*
[13] Jin Zhu letter, pg. 2.
[14] Jinhui Chen letter.
[15] *Id.*
[16] Yue Lu letter.
[17][17] Jinhui Chen letter.
[18] *Id.*
[19] Hui Xiang letter.

Mr. Xiang "is a very loving and caring person."[20]  He has a "willingness to help others, diligence and dedication to work and family."[21] And when it comes to others, he "does not mind doing hard work"[22].  Whether it is helping international students settle in, hosting and entertaining out-of-country guests, taking care of his ill mother, loaning his scholarship stipend to friends who needed financial help, or visiting elderly people during weekends and holidays, Mr. Xiang was always "thoughtful of others and very supportive."[23]

At his core, Mr. Xiang "is an introvert. He's quiet and does not talk much in a crown.  However, whoever he's friended with would applaud on his kind soul."[24] "He never said no to anyone who'd asked for his help.  He himself lives a simple with little desire for materials"[25] There are truly very few people "who are about loves ones [other] than himself in this consistent way"[26] as Mr. Xiang.

The past twenty-nine (29) months he has spent in custody have certainly weighed heavily on Mr. Xiang.  Prior to his incarceration, he had moved to China because of "the pressure he felt from his family, particularly his (abusive) father, to move back to China to care for his parents."  PSR, ¶ 59. It was their position that because of the sacrifices that made to provide of his education, he owed it to them. And because he "cares deeply about his parents"[27], he obliged.

---

[20] Weizhong letter, pg. 1.
[21] Hongyun Wang letter.
[22] Weizhong letter, pg. 2.
[23] Hongyun Wang letter.
[24] Jin Zhu letter, pg. 3.
[25] *Id*.
[26] *Id*., pg. 4.
[27] *Id*., pg. 3

Mr. Xiang's mother had fallen down a staircase decades ago which broke her him and left her permanently disabled.  She has not been in good health ever since. More recently she suffered a stroke and has gotten worse over the past two years. His father, too, had chronic lung disease which deteriorated over time.  He passed away in 2019, and although he had been abusive, it left Mr. Xiang devastated.  He is now terrified and desperate that he may not be able to see him mother because she, too, passes away.

Mr. Xiang clearly regrets his actions in this case.  Coping with these situations is never easy, but for someone with his cultural background it is much more difficult. In the Chinese culture, shame is the greatest punishment one can bring upon himself and his family.  To make matters worse, Mr. Xiang will be deported following the completion of his sentencing, being forced to leave his wife and fourteen (14) year old daughter behind. He will never have the opportunity to come visit them, again.  As he has awaited their fate over the last twenty-nine (29) month, he and his wife have begun to "explore the meaning of life other and [became]more religious."[28]   Through this journey, he has come "to a deep realization that every individual has his own pain and suffering to endure, and all could benefit from sustained support.  He developed a new level of scope for the future of his life: he wants to devote his time and life to help people relieve pains and become stronger with his knowledge and religion."[29]

Above all else, Mr. Xiang knows that he let everyone, including himself down.

_____

[28] *Id*.
[29] *Id*.

As a person who was once "soft tempered" and "caring", is now a shell of his former self.  Mr. Xiang wants nothing more than to be able to live his life as the person everyone know and believed him to be.   His remorse is genuine and cannot be overstated.

## II.   RECIDIVISM, DETERRENCE, AND OTHER POLICY CONSIDERATIONS

According to § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." Granted a sentence must reflect the seriousness of the offense and provide for adequate deterrence, the effect on Mr. Xiang resulting from his conviction and term of incarceration have already, and will continue to, ensure that the purposes of sentencing, deterrence, and respect for the law will still be fully vindicated if this Honorable Court imposes a sentence of time served. Such a sentence would not deprecate the seriousness of the offense and would provide adequate specific and general deterrence. *See Gall*, 552 U.S. at 54.

In making its determination for Mr. Xiang's appropriate sentence, this Court must consider his age and non-existent criminal history.  The sentencing guidelines, in and of themselves, fail to consider the age at which an individual is arrested for his first felony.  Because Mr. Xiang's first conviction comes at the age of 44, his chances of recidivism continue to drop.  *See, e.g., United States v. Szanto*, 2007 WL 3374399 (N.D. IL Nov. 8, 2007) (Manning, J.) (defendant was unlikely to commit future crimes because he was almost 48 when committed first offense) *citing Unites States v. Bullion*, 466 F3D 574, 577 (7th Cir. 2006) (citing studies that examined relationship between age and recidivism.) Another example, even pre-Booker, is

United States v. Ward, where the court granted a downward departure because the defendant was 49 when he committed his first crime. 814 F.Supp 23 (E.D. Va. 1993).

Moreover, being a first-time felony offender is in and of itself an appropriate basis for a downward variance. *See, e.g., United States v. Tomko*, 562 F.3d at 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history"); *United States v. Moore,* 344 F. App'x 767, 768 (3d Cir. 2009) (unpublished) (affirming downward variance to probation based on defendant's "law abiding life style throughout her life"); *States v. Huckins,* 529 F.3d at 1317 (10th Cir. 2008) (affirming that district court's downward variance of 60 to 79 months below the calculated Guidelines range was reasonable and permissibly took into account the Defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d at 1142-43 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months' imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and her offense was "highly out of character").

As a 44-year-old first-time felony offender and as someone who has never been subjected to a term of imprisonment (nor charged with any crime), any incarceration will undoubtedly have a severe impact on Mr. Xiang's, certainly more so than someone that has not only been previously subjected to imprisonment before. *See United States v. Baker*, 445 F.3d 987, 990-92 (7th Cir. 2006) (upholding downward variance because "a prison term would mean more to [a defendant who has never

been incarcerated before] than to a defendant who previously has been imprisoned"). Courts have recognized that often-times a shorter term of incarceration may be sufficient to deter an offender who has not previously experienced the deterrent effects of incarceration. *United States v. Mishoe*, 241 F. 3d 214, 220 (2nd Cir. 2001), *United States v. Lewis*, 459 Fed. Appx. 742 (10th 2012), *United States v. Santoya*, 493 F. Supp. 2d 1075, 1081 (E.D. Wisc. 2007). "A major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served [lengthy prison sentences] and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial… conversely, if a defendant served no time or only a few months for the prior offenses, [than a shorter sentence] for the current offense might be expected to have the requisite deterrent effect." *Mishoe* at 220. "Generally, a lesser period of incarceration is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend." *Santoyo* at 1081.

To that end, in imposing a sentence, district courts are generally allowed to consider the conditions of a defendant's pretrial confinement under § 3553(a). *United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (per curium); *United States v. Rorrer*, 161 F. App'x 518, 522

(6th Cir. 2005) (unpublished); *See also United States v. Dyck*, 334 F.3d 736, 742-43 (8th Cir. 2003). It may be somewhat uncomfortable to think of it this way, but the purpose of punishment is to impose suffering upon a prisoner (not cruel and unusual suffering, but some suffering nonetheless). For that reason, how harsh the conditions of confinement are is relevant to the questions of (1) whether retribution has been satisfied and (2) whether the punishment is sufficient to effect specific deterrence. The instant pandemic required that detainees be held under much stricter conditions than those to which they are normally subject. The degree of freedom of movement that was allowed prior to the pandemic in jail facilities has been severely limited. Detainees have more limited access to communal areas and recreation. They are allowed fewer contacts with their friends and family. That may be necessary to try to protect the inmate population and staff, but it imposes an additional and very real hardship upon prisoners beyond what they are normally required to endure. That increases the harshness of Mr. Xiang's pretrial confinement is beyond what typical detainees face as they await judgement before courts. While that fact, by itself, does not necessarily justify a downward variance from the guidelines but it is certainly a relevant consideration.

What is more, Mr. Xiang's status as an individual subject to removal proceedings, while in the custody of the Department of Homeland Security and U.S. Immigration and Customs Enforcement (ICE), can and should be considered by this Court in imposing sentence. *See, e.g., United States v. Arowasaye*, 112 Fed. Appx. 528, 532 (7th Cir. 2004)("the district court possessed the authority to depart

downward based on [defendant's] status as an alien deportable to Nigeria who faces an additional term of incarceration there that is not accounted for[.]").  Similarly, in *United States v. Ngatia*, the Seventh Circuit relied on a reduced need to incapacitate a deportable alien in affirming a below-guideline sentence. *Id*., 477 F.3d 496, 502 (7th Cir. 2007).  At the end of his sentence, Mr. Xiang will be subject to removal from the United States and will likely endure additional incarceration prior to deportation. This "additional term of incarceration" which is unaccounted for in the sentencing guidelines can and should be considered by this Court in arriving at a fair and just sentence.   To that same end, while many individuals sentenced post-First Step Act will receive additional days of time credit (10-15 days for every 30 days served for eligible prisoners who successfully participate in recidivism reduction programs or productive activities), Mr. Xiang will not be able to benefit from this change in the law because of his immigration status in his country.  *See* FIRST STEP ACT, S. 756, Sec. 3632(d)(4)(E) ("Deportable Prisoners Ineligible to Apply Time Credits").

Undoubtedly, Mr. Xiang deeply regrets the poor decision she made which landed her before this Court. The publicity and political undertones that have surrounded this case has instilled a shameful stigma on a person that has previously exemplified high moral fiber.  The emotional tolls these proceedings have taken on Mr. Xiang and his family are tremendous and cannot be overlooked.  The pressure and mental anguished that he has suffered through since the inception of this case assure that Mr. Xiang will never see another courtroom again.  To Mr. Xiang, the embarrassment surrounding the current conviction is enough to deter from any

future criminal acts.  Although hindsight is always twenty-twenty, Mr. Xiang knows that he gained nothing from committing the instant offense, especially considering the tolls the consequences of his actions have taken on him and his family.

While a sentence must reflect the seriousness of the offense and provide for adequate deterrence, the effect Mr. Xiang resulting from his conviction will ensure that the purposes of sentencing, deterrence, and respect for the law will still be fully vindicated if this Honorable Court imposes a sentence of time served. Such a sentence would not deprecate the seriousness of the offense and would provide adequate specific and general deterrence.  *See Gall*, 552 U.S. at 54.  The limitations put forth with such a sentence, in conjunction with the significant collateral consequences of a federal felony conviction, and deportation, will suffice to not only deter Mr. Xiang from future crimes, but will serve as a deterrent to all potential offenders.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008) ("But as to [general deterrence], there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white-collar' offenders") (citations omitted); *see also* U.S.S.C., *Fifteen Years of Guidelines Sentencing* 56 (2004) (Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white-collar' cases, both to ensure proportionate punishment and to achieve deterrence").

### III.    A SENTENCE OF TIME-SERVED WILL BE JUST PUNISHMENT

This Court is inherently tasked with an incredibly difficult decision as to what

a just punishment is for any given defendant.  *See, Adelson*, 441 F.Supp.2d at 515 ("[I]t is obvious that sentencing is the most sensitive, and difficult, task that any judged is called upon to undertake.").  Here, any sentence more than time-served would not only be harsh but also much greater than necessary.  The instant offense does not involve the use of violence, the possession of weapons, or the distribution of drugs.  Mr. Xiang is not dangerous and does not pose a threat to society.  And while he makes no effort to deprecate the seriousness of the offense and understands the need for retribution, an appropriate sentence in this case should not vary from the 29 months he has already spent in custody, which is already nearly double to top of the advisory guidelines and nearly triple the low-end of the advisory guidelines.

The goal of sentencing is to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2).  Through this "parsimony provision," the Court is to impose a sentence that is the *minimum* necessary to accomplish those goals set forth in paragraph (2).  Mr. Xiang makes no effort to deprecate the seriousness of this offense and understands the need for retribution.   Nonetheless, any further imprisonment would go beyond what is necessary to accomplish the purposes of sentencing.

Mr. Xiang is not a violent or evil-minded criminal who poses a dangerous threat to society.  He is a 44-year-old first time offender who has openly and candidly admitted all of his conduct. For over four years, since first being apprehended by Customs and Border Patrol at O'Hare Airport, Mr. Xiang's entire life has been consumed by his wrongdoings, the ripple-effects of which have been felt dearly by the

ones closest to him.  While retribution is warranted in the instant matter, any further imprisonment will deviate beyond the purposes of sentencing.

To that end, Mr. Xiang makes no effort to deprecate the seriousness of this offense and understands the need for retribution.   Nonetheless, any further imprisonment would go beyond what is necessary to accomplish the purposes of sentencing.  Here, there is no doubt that a term of imprisonment is expected, and it has already been served. And although the seriousness offense is not in question, the totality of the crime when juxtaposed against the considerations outlines above weight in favor of compassion and leniency.  To that end, Mr. Xiang. respectfully requests a sentence of time-served because that is a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.

No matter the sentence, there will be a permanent and profoundly negative impact on Mr. Xiang's life and freedom.  The stigma carried by a federal felony conviction blights a person's life, forever.  There are no shortages of limitations placed upon an individual's life including social stigma, psychological impact on the defendant and his family, along with the curtailment of even the most basic freedoms. In this case, Mr. Xiang is also facing deportation and being separated. From his wife and child for an indefinite period.  Given the situation, a sentence of time-served will not only adequately reflect the seriousness of the offense and promote respect for the law but will also provide just punishment.

IV.    DISPARITIES WITH SIMILAR DEFENDANTS

Sentencing courts are instructed to avoid unwarranted sentencing disparities

among similarly situated defendants.  *See* 18 U.S.C. § 3553(a); *Gall v. United States*, 552 U.S. 38 (2007) (endorsing district court's use of discretion in applying this provision).  Since the enactment of the Economic Espionage Act, 18 U.S.C. §§ 1831-1891, many individuals sentenced for violations under § 1832 received a low-end or below-guideline sentence, many of which received probation, home confinement, or a very short prison sentence.  While all sentences turn on particular facts that are unique to each individual, this Court must consider the following sentences in making its determination as to what Mr. Xiang's appropriate sentence should be:

In *United States v. Chunlai Yang*, 11-CR-458 (N.D. Ill.), the defendant was a senior software engineer for the Chicago Mercantile Exchange and downloaded over 20,000 files containing the source code for the Exchange's trading platform. Along with partners, he formed a business in China that offered to upgrade Chinese trading exchanges using the stolen source code. The government asserted two loss amounts: $50 million based on a prior joint venture CME entered with an overseas company, and $23 millions based on the defendant's market projections for his company. On the two counts of trade secret theft, the defendant was sentenced to two concurrent terms of four years' probation.

In *United States v. David Yen Lee*, 09 CR 290 (N.D. Ill. 2010) (Gettleman, J.), the defendant pled guilty to stealing trade secrets for Valspar. The defendant had accepted a job with a Chinese company and had copied the trade secrets to thumb drives, although he did not tender the trade secrets to the Chinese company. The government claimed the proprietary trade secret was valued at $20 million. The

defendant in turn was sentenced to 15 months' imprisonment. As in this case, no actual loss occurred.

In *United States v. Zhiqiang Zhang*, 10 CR 827 (N.D. Cal.), the defendant was sentences to five years' probation after stealing over 100,000 files from a technology company developing source code for location-based services for mobile phones. After the defendant accessed the company's password protected database and stole the source code, he established personal entities in the United States and China in order to develop and sell similar location-based services.

In *United States v. Laude*, 06 CR 2147 (S.D. Cal.), the defendant, after being hired by Nokia, downloaded almost 450,000 files of source code from his employer, Qualcomm, which Nokia in turn used to design and announce a product to directly compete with Qualcomm's. Although the defendant was the main architect of the product, after pleading guilty, he was sentenced to three years' probation.

In *United States v. Platts*, 05 CR 430 (C.D. Cal.), the defendant was sentenced to two years' probation, with $170,000 in restitution, after downloading his employer's pricing strategy for the following year and sending the information to a competitor in an email containing the message "hope this competitive information helps."

In *United States v. Malhotra*, 08 CR 423 (N.D. Cal.), the defendant was sentences to five months' imprisonment and three years' supervised release after he pled guilty to taking information and strategic pricing plans when he left IBM and showed the proprietary information to two vice presidents of HP.

In *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016), the defendant was a regional director of an executive search firm but left the company to start his own firm, taking fellow co-workers with him. The defendants accessed the firm's proprietary database containing "information on over one million executives" multiple times and downloaded information on thousands of executives. He was convicted of one conspiracy count, three CFAA counts, and two counts of trade secrets theft. He was sentenced to one year and a day imprisonment.

In *United States v. Yu Xue and Tao Li*, 16-0022 (E.D. Penn. 2016), the defendants, Xue and Li, pled guilty to one count of conspiracy to steal trade secrets in violation of the EEA. Defendant Xue stole trade secret information from an American pharmaceutical company for the benefit of her own pharmaceutical company she formed in China with coconspirators, including Li. The government alleged that the trade secrets were valued at over $1 billion, including costs of development and its fair market value. The court, however, determined that the loss amount under the Guidelines was $0, and sentenced Xue to eight months imprisonment and Li to time served (59 days imprisonment) and five months of home confinement.

In *United States v. Yihao Pu*, 814 F.3d 818 (7th Cir. 2016), the defendant was a quantitative analyst and engineer at two large financial firms who pled guilty to two trade secret offenses. The defendant stole the source code to a high frequency trading system by copying it to his personal storage devices which the government valued at $12 million based on cost of development. The Seventh Circuit vacated the

sentence because the cost of development was not the proper measure for intended loss. On remand, the defendant was resentenced to 18 months' imprisonment.

In *Wai Hung Tam Sing v. United States*, CR-14-212-CAS; 2019 WL 3890823 (C.D. Cal. 2019), the defendant was convicted of four counts of trade secret theft under the EEA for stealing electronic schematics from his employer and distributing them to competitors. The trade secrets had already generated millions in revenue and was anticipated to generate $18 million more in the immediate future in new projects. The defendant was sentenced to a year and a day imprisonment.

In *United States v. Martin*, 228 F.3d 1 (1st Cir. 2000), the defendant was a chemist who developed veterinary products for his company. He was convicted of conspiracy to steal trade secrets, four counts of wire fraud, two counts of mail fraud, and one count of conspiracy to transport stolen property. He was sentenced to concurrent terms of one year and a day imprisonment on the eight counts of conviction.

In *United States v. Alan Roberts and Sean Howley*, 08-CR-175 (E.D. Tenn. ), *appeal* 707 F.3d 575 (6th Cir. 2013), the defendant were involved in a scheme to steal trade secrets on manufacturing machines from American tire companies and use the secrets to build machines for a Chinese tire manufacturer. They were convicted of seven counts of stealing trade secrets under the EEA and three counts of wire fraud. Upon remand requiring the sentencing court to explain its reasons for finding the loss amount to be $0, the defendants were each resentenced to concurrent terms of 4 years' probation on all counts.

In *United States v. Hsu*, 97-CR-323; (E.D. Penn. ), *interlocutory appeal* 155 F.3d 189 (3rd Cir. 1998), the defendant pled guilty to one count of conspiracy to steal trade secrets in violation of the EEA for a scheme to buy cancer drug trade secrets from a scientist at a pharmaceutical firm. The defendant was sentenced to time served and two years of supervised release.

In *United States v. Wilkinson*, 07-CR-570-WMN-2 (D. Md. ), *appeal* 590 F.3d 259 (4th Cir. 2010), the defendant pled guilty to three offenses: one count of conspiring to defraud the United States, one count of conspiring to commit wire fraud, and one count of conspiring to steal trade secrets. The defendant stole trade secret information from competitors to win procurement bids from the department of defense. Despite the government seeking a loss amount of over $500,000, the court sentenced the defendant to concurrent sentences of three years' probation.

In *United States v. Smith*, 22 F.4th 1236 (11th Cir. 2022), the defendant was a software engineer was convicted of extortion and theft of trade secrets, extorting trade secrets regarding private reefs in Florida from a company that mapped the reefs. His guidelines for the two convictions were 33-41 months but was given a sentence of 18 months and one year of supervised release.

Mr. Xiang's sentence should not be any more than time-served, which is already nearly double to top of the advisory guidelines and nearly triple the low-end of the advisory guidelines.  Any longer sentence would not be justified by the facts in this case.  Thus, to avoid sentencing disparities, this court should impose a sentence of time served.

## CONCLUSION

This Court holds significant discretion to not only craft a reasonable, appropriate sentencing pursuant to the guidelines, but to consider the totality of circumstances surrounding the individual involved, including, among others factors, Mr. Xiang's personal history and characteristics, collateral consequences of his convictions, and unwarranted sentencing disparities.   The foregoing considerations outlined in this submission, as well as in the character letters submitted on his behalf show only a small portion of who Mr. Xiang truly is: a proud and dedicated father, husband, and friend. Mr. Xiang is truly apologetic for his actions and wants nothing more than to get past this next hurdle of his life and become, once again, the person everyone knew him to be prior to his arrest.  In sentencing Mr. Xiang to time-served, this Court would accomplish the goals of sentencing by punishing the individual, not the crime, to a sentence that is sufficient, but not greater than necessary.  *See Pepper*, 131 S.Ct. at 1240.

Respectfully submitted,


s/ Vadim A. Glozman

LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Ste. 1410
Chicago, Illinois 60604
(312) 726-9015
vg@glozmanlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 28, 2022, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: all Attorneys of record.

s/ Vadim A. Glozman____

Vadim A. Glozman #6315389IL

LAW OFFICES OF VADIM A. GLOZMAN

53 W. Jackson Blvd., Ste. 1410

Chicago, Illinois 60604

(312) 726-9015

vg@glozmanlaw.com
