UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:19-cr-00980-HEA |
| HAITAO XIANG, | ) ) ) |
| Defendant | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and undersigned counsel, for its Sentencing Memorandum and states as follows:

On November 15, 2019, the defendant was arrested on a criminal complaint charging him with conspiracy to commit theft of trade secrets in violation of 18 U.S.C. § 1832. The defendant was ordered detained and has remained in federal custody since that date. On November 21, 2019, a grand jury returned a multi-count indictment charging the defendant with theft of trade secrets and economic espionage offenses.

On January 6, 2022, the defendant pled guilty to Count I of the Indictment – conspiring to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5). As described in his plea agreement, the defendant conspired to steal the Nutrient Optimizer, a trade secret of TCC and Monsanto. On June 9, 2017, at his exit interview from Monsanto, the defendant falsely denied (orally and in writing) that he had retained any of Monsanto's intellectual property. Just two days later, he attempted to board a flight to travel from Chicago to Shanghai. At the airport, members of law enforcement searched the defendant and located several electronic devices,

1

including a Micro SD Card that contained the Nutrient Optimizer. But for the search of the defendant by law enforcement, he would have succeeded in transferring the Nutrient Optimizer to the PRC government. In so doing, the defendant intended and knew the trade secret would benefit the CAS, a foreign instrumentality, and the PRC, a foreign government.

On March 3, 2022, the United States Probation Office prepared and filed a disclosure of the Presentence Investigation Report ("PSR"). Doc. 138. The United States accepts, and has no objection to, the PSR. The PSR sets forth a total offense level of 12 and a criminal history category of I, which corresponds to an advisory Guidelines range of 10-16 months of imprisonment. Notably the U.S. Probation Office also found in the PSR that a departure or variance may be warranted. The PSR states:

> There may be cases in which the offense level determined under USSG §2B.1 substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted. USSG §2B.1, Application Note 21(A). Also, a departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense. USSG §5K2.5. In this case, the defendant's conduct is a serious offense where the defendant, who had a comprehensive understanding of his duty of confidentiality to his employer, sought to benefit himself and the PRC and CAS and may not be adequately captured in the guideline calculation as there is no Offense Level increase for intended loss or gain. Specifically, when first hired and on several occasions during his employment, Xiang agreed he would not use the Nutrient Optimizer for himself or disclose the trade secret to others. **It took TCC thousands of hours over numerous years and hundreds of millions of dollars to develop the Nutrient Optimizer**. Xiang stole the Nutrient Optimizer in order to replicate the Nutrient Optimizer in the PRC for the CAS. **If Xiang had been successful in stealing and implementing Monsanto's trade secret in the PRC, Monsanto's exclusive access to their proprietary information would have reduced their international market value.** Further, because of the theft and intended delivery of the trade secret, Xiang realized an annual gain of at least $199,998. Therefore, an upward departure maybe warranted in this case. (Doc. 138 at 18) (**emphasis added**).

For the reasons set forth herein, the United States recommends that the defendant be sentenced to a term of imprisonment of between 28 to 37 months.

### APPLICATION OF THE 18 U.S.C. § 3553(a) FACTORS

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

The defendant was convicted of conspiracy to commit economic espionage. The defendant stole the Nutrient Optimizer, in the form of an 86-page digital file. Notwithstanding all of the training the defendant received and the promises he made to his employer, the defendant willfully and egregiously stole Monsanto's proprietary information for the benefit of himself and the PRC.

<u>The Nutrient Optimizer and The PRC's Agricultural Modernization Efforts</u>

The Nutrient Optimizer was a proprietary predictive algorithm to assist farmers in the optimal application of plant nutrients. The Nutrient Optimizer was an essential component of the digital farming software platform. It was also part of the application that worked as a web-based tool that allowed farmers to monitor the nutrient status of their fields in real-time by combining the latest weather data, soil information, and management information within a scientific model. In addition, it allowed farmers to test the effectiveness of various nutrient management scenarios by predicting the likely end-of-season nutrient status, as well as the uncertainty of the nutrient status due to weather, to allow more precise subsequent fertilization to optimize inputs for the next crop. The scientific foundation of the Nutrient Optimizer was a point-based biogeochemical process model that simulated biological, chemical, hydrological, and thermal processes occurring within an agricultural field.

In February 2016, the defendant applied to the Hundred Talents Program ("HTP"), which is one of the People's Republic of China's ("PRC") Talent Programs. The HTP was exclusively

designed to cultivate scientific research personnel to work at various Chinese Academy of Sciences (CAS) organizations.[1] Chinese government guidance on Talent Program applications provides that HTP Recruits must provide evidence of the work they performed on projects they list on their applications, such as research results or innovative achievements. In most cases, an HTP Recruiter asks an applicant for materials and information about the work the applicant has performed, or projects they have worked on, which the Talent Recruiter knows to be sensitive. This often includes the proprietary intellectual property of a company, or information that requires a license to be exported from the United States to China.

Talent Recruits sign contracts covering their participation in Talent Programs. These contracts obligate the Recruits to work for a specified period in China, and often detail the specific research the Talent Recruit will perform or specify the business that is to be developed by the proposed new company. This contractual obligation closely resembles or even replicates the work the HTP Recruit performs or performed for his or her U.S. employer, thus demonstrating the HTP Recruit's willingness to leverage knowledge and intellectual property obtained from U.S. businesses, corporations, and even U.S. government laboratories. This contractual relationship differentiates HTPs from standard scientific research grants or conventional international collaboration. Rather than conducting basic scientific research, Talent Recruits are contractually obligated to build upon their expertise and prior work by performing services for China in support of its strategic national development goals and economic revitalization.

The PRC has prioritized improving its agricultural productivity. The "Made in China 2025" initiative targeted ten sectors, including information technology and agricultural

---

[1] *See* Global Recruitment of Pioneer "Hundred Talents Program" of CAS----Chinese Academy of Sciences. At https://english.cas.cn/newsroom/archive/jobs_archive/job2015/201512/t20151204_157107.shtml

4

machinery.  Additionally, the PRC's Thirteenth Five-Year Plan (2016-2020) listed Agricultural Modernization as a major project.  The Plan sought to improve systems for promoting innovation in and the application of modern agricultural science and technology, accelerate agricultural mechanization, strengthen the integration of information technology into agriculture, and develop intelligent agriculture.  The Plan promoted the development of intelligent agriculture using big data in agriculture, strengthening agricultural information services, encouraging internet enterprises to establish agricultural service platforms that would bring together the processes of production and marketing, accelerating the development of agriculture-related ecommerce, and transforming nitrogenous fertilizer.[2]

The Defendant Conspires to Steal the Nutrient Optimizer

It appears that Xiang identified the Nutrient Optimizer as a potential solution to the PRC's modernization challenges.  In his February 2016 Talent Plan application, the defendant wrote:

> I will establish an intelligent and digital agricultural fertilizer management platform based on big data.  This will achieve soil nutrient management and precise fertilizer application informatization and intelligentization.  After carrying out demonstration applications and achievements and the platform is mature, it will be promoted throughout the rest of China.

In essence, the defendant was describing the Nutrient Optimizer and Monsanto's fertilizer management platform.  That same month, the defendant downloaded the Nutrient Optimizer from Monsanto's computer systems to his work laptop computer.  He also transferred the Nutrient Optimizer onto a Micro SD Card.

After being accepted to the HTP, the defendant applied for and ultimately obtained an employment position with the PRC and the Chinese Academy of Sciences (hereinafter "CAS") in the Nanjing Institute of Soil Science ("NISS").  The CAS is a ministry under the State

---

[2] http://en.ndrc.gov.cn/newsrelease/201612/P020161207645765233498.pdf

Council of the PRC, which is the highest executive arm of power and administration in the PRC. The NISS focuses on scientific agricultural development and ecological environmental development in the PRC.

With these acts, the defendant betrayed not only TCC and Monsanto, which entrusted him with its trade secrets, but also his adopted country. As the PSR reflects, the defendant is highly educated and extremely intelligent.[3] Not only should he have known better, he <u>did</u> know better. When the defendant began his employment with Monsanto in 2008, he signed an employment agreement acknowledging that TCC and Monsanto possessed certain non-public confidential business information, including engineering designs, drawings, formulae, calculations, data, or similar technical or project-related information. He acknowledged that he would receive access to this confidential information. The defendant agreed he would not, directly or indirectly, use (for himself or another) or disclose any confidential information for so long as it remained proprietary or protectable as confidential or a trade secret, except as may be necessary for the performance of his duties. The defendant was extensively trained and tested repeatedly on the protection of trade secrets by TCC and Monsanto.

During his exit interview, the defendant signed an exit agreement and a TCC Termination Certification. In those documents, the defendant certified that he did not have in his possession, nor had he failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, documents or property, or copies and reproductions of such items belonging to TCC. The defendant knew

---

[3] Defendant received a Bachelor of Science and Master of Science degrees in Mechanical and Electrical Engineering from Nanjing Forestry University located in Nanjing, China. He earned a Doctorate Degree in Agricultural and Biomedical Engineering from the University of Illinois in Champaign, Illinois. (Doc. 138 at 13)

his certifications were false.

During his exit interview, the defendant said that he returned all TCC and Monsanto property, and that he had no storage devices with company information. The defendant told the victim that he did not retain, and had no TCC or Monsanto confidential business information, or property or copies of such materials on any devices or computers.  He also stated he did not have any Monsanto or TCC property physically or electronically stored in any location.  The defendant also knew that these statements were false.  The fact that the defendant was extensively trained to protect trade secrets and was asked prior to his departure whether he retained any of those trade secrets further highlights the egregiousness of the defendant's conduct.

Harm to Monsanto and TCC

The specific loss in this case is difficult to calculate.  As stated in the PSR, "[i]t took TCC thousands of hours over numerous years and hundreds of millions of dollars to develop the Nutrient Optimizer."  However, TCC and Monsanto cannot provide a precise value for the Nutrient Optimizer because the value depends on a variety of factors, including evolution of the algorithm and chances to the markets in which the Nutrient Optimizer is deployed. Similarly, the research and development costs associated with the Nutrient Optimizer are difficult to identify precisely.  Monsanto also explained that its market share or value has not been materially impacted by the defendant's theft.

Notwithstanding the challenges with valuing the Nutrient Optimizer, the defendant knew he would benefit financially from his crime.  To entice high-caliber individuals to apply, the PRC rewards some Talent Recruits with significant financial and social incentives.  Each Talent Recruit draws a salary from the employing unit, such as Chinese laboratories or research organizations.   In this case, after the theft, the defendant moved from the United States and

7

operated a scientific lab at NISS that conducted agricultural research. The defendant worked therefore for several years and received compensation including an annual salary of $52,941, a housing stipend of $132,352, a housing rental subsidy of $14,705, and a resettling fee of $29,411. The government estimates that the defendant's total financial gain in connection with his employment at CAS and the NISS was somewhere between $250,000 and $550,000.

<u>An Upward Adjustment is Warranted</u>

According to the Sentencing Guidelines, the Court should apply the greater of actual loss or "intended" loss, and in the absence of "reasonably foreseeable pecuniary harm that resulted from the offense," the Court should consider "the pecuniary harm that the defendant purposely sought to inflict." *See* U.S.S.G. § 2B1.1, app. 3(A)-(C)(i),(ii); *see also United States v. Yihao Pu*, 814 F.3d 818, 822 (7th Cir. 2016) (finding that intended loss was the appropriate framework for analysis in a theft of trade secrets case for Guidelines purposes where "the parties agreed, and the district court found, that there was no actual monetary loss"); *United States v. Yu Xue*, No. CR 16-22, 2020 WL 5645765, at *14, n.30 (E.D. Pa. Sept. 22, 2020) (finding that "[i]n this case, only 'intended loss' is relevant" because the government presented no evidence the defendant's trade secret theft had impacted the victim company's market share or caused the victim to lose money in sales).

Intended loss is the "loss the defendant *purposely* sought to inflict." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011). As then-Circuit Judge Neil Gorsuch explained in *Manatau*, "an inquiry into a defendant's mens rea is required when determining his intended loss," meaning that the defendant had as his conscious object to cause the victim to sustain the loss. *Id*. at 1049-1050. The United States Sentencing Commission explicitly adopted the *Manatau* approach. Prior to November 2015, Application Note3(A) defined intended loss as "the pecuniary

8

harm that was intended to result from the offense[.]"  By changing the language to "the pecuniary harm that the defendant purposefully sought to inflict," the Sentencing Commission after *Manatau* recognized that enhancements "predicated on intended loss . . . should focus more specifically on the defendant's culpability."

For several reasons, it is difficult to measure precisely the loss the defendant intended to inflict.  The defendant was an imaging scientist, meaning that he only contributed to part of the Nutrient Optimizer and the platform of which it was a part.  It is unclear how much he knew about the research and development costs or potential profit Monsanto and TCC could have made from licensing the Nutrient Optimizer.  Further, Monsanto and TCC were unable to provide the government with a precise valuation for the Nutrient Optimizer or its research and development costs.

Nevertheless, the government submits that the defendant did intend to cause some harm to the victim.  Subjective intent can be gleaned from "reasonable inferences" about the defendant's mental state from the available facts."  *Manatau*, 647 F.3d. at 1056.  As detailed below, the government submits there are three ways to view the potential harm and value of the defendant's actions.  For the same reasons, the government agrees with the Probation Officer that the Sentencing Guidelines underrepresent the seriousness of the defendant's theft.

First, the Court should consider that the defendant intended to use the stolen information in a way that would deprive TCC and Monsanto of its value.  The defendant necessarily recognized that the information he stole could be used in a way that would deprive TCC and Monsanto of its value.  In other words, the defendant intended that he and the PRC would build upon TCC's work, by further developing the Nutrient Optimizer in China and potentially deploying the product internationally.  It is also clear by stealing the Nutrient Optimizer the defendant also intended that

9

he and the PRC would save millions of dollars and years of research by using the product TCC and Monsanto had already created, rather than developing an independent product. Although at the time of the theft TCC and Monsanto were not marketing the Nutrient Optimizer or the software platform on which it was used in the PRC, and there is no evidence the defendant intended to specifically inflict pecuniary damage on Monsanto, he would have recognized the benefits, including time and money saved.

     Second, it is a reasonable inference that the defendant knew the Nutrient Optimizer was valuable to the PRC. In his HTP application, the defendant quoted the PRC's Thirteenth Five-Year Plan (2016-2020), which promoted the development of intelligent agriculture using big data in agriculture, including transforming nitrogenous – exactly the goal of the Nutrient Optimizer. Based upon the statements in his application, the defendant knew his position with CAS was predicated, at least in part, on his ability to fulfill the goals of the Five-Year Plan through the Nutrient Optimizer. Since the defendant only worked on a small portion of the Nutrient Optimizer – imaging, he did not have the knowledge, education, or background to create a similar product, which necessitated his theft of the Nutrient Optimizer. It is therefore clear from the defendant's theft, that he valued the Nutrient Optimizer *at least* by the amount he expected to be compensated for it through the HTP program.

     Third, the Court should consider the defendant's gain from his crime. Section 2B1.2 Application Note 3(B) states that the "court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss, but it reasonably cannot be determined." Although the government does not have independent documentary evidence of the amounts of compensation the defendant received from the PRC, in May 2016, the defendant negotiated the terms of his future employment with the CAS and exchanged emails with representatives of the

10

Hundred Talents Program. Because the defendant departed TCC in June 2017, and was arrested in November 2019, the term of his employment with the CAS was approximately 2.5 years. His compensation included an annual salary in the amount of $52,941, a housing stipend in the amount of $132,352, a housing rental subsidy of $14,705, and a resettling fee of $29,411. Therefore, the government estimates that the defendant's total financial gain in connection with his employment at CAS and the NISS is between $250,000 and $550,000. Considering USSG § 2B1.1(b)(1)(G), if losses are greater than $250,000 and less than $550,000, then 12 levels are added to the offense level. After acceptance of responsibility, this corresponds to a total offense level of 15 and a USSG range of 18 to 24 months imprisonment.

Because TCC and Monsanto have not been able to quantify loss, the government urges the Court to consider Defendant's intended gain as non-binding guidance in assessing the amount or degree of any upward variance. *See* USSG § 2B1.2 App. Note 3(B)[4] ("[The] court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss* but it reasonably cannot be determined" (emphasis added)). *Cf. United States v. Andersen,* 45 F.3d 217, 221 (7th Cir. 1995) ("While gain may normally prove an adequate surrogate for loss, gain may be used only as an alternative method of calculation when there is in fact a loss, and only if use of the gain results in a reasonable estimate of the loss." (quotations omitted)); *see United States v. Haddock,* 12 F.3d 950, 960 (10th Cir. 1993) (the defendant's gain may be used only as an "alternative estimate" of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims).

---

[4] The government is not asserting that the PSR's guidelines calculation for this case is incorrect. Rather, we submit that defendant's intended gain is relevant for the Court to consider in determining whether the guidelines understate the seriousness of the offense in this particular case.

The government also urges the Court to consider the research and development costs TCC and Monsanto expended in determining that an upward variance is appropriate, given the savings that the PRC would have incurred as a result of defendant's theft.  The government anticipates that the victim company will inform the Court that it in fact cost millions of dollars to develop the Nutrient Optimizer.   Using a conservative range, if losses are greater than $1,500,000 and less than $3,500,000, then 16 levels are added to the offense level.  *See* USSG § 2B1.1(b)(1)(I), This corresponds to a total offense level of 19 after acceptance of responsibility and a USSG range of 30 – 37 months imprisonment.

2. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Rule of Law, and to Provide Just Punishment for the Offense.**

As stated above, defendant sought to betray TCC and Monsanto for the benefit of the PRC.  For trade secret offenses that are thwarted before they can reach their ultimate goal, the U.S. Sentencing Guidelines quantify the seriousness of such offenses based largely on intended loss to the victims. *See* USSG §2B1.1.  Intended loss is extremely difficult to quantify in this case.  Based on defendant's own statements, he knew and intended his crime to benefit not just himself but his home country (the PRC), which could only be accomplished by stealing from the victim company.  By any measure, this is an extremely serious offense that merits a serious sentence.

The sentence must also promote respect for the rule of law.  Every day, across this country, countless employees are entrusted with valuable, proprietary information that they need in order to do their jobs.  If they disclose that information – even accidentally – it would harm their employers.  The consequences could range from mild to severe, including lost profits, lost jobs, lost opportunities, or worse.  An upward variance would promote respect for the rule of law

12

among the countless persons employed by or with access to the proprietary trade secrets of American businesses, who may be tempted by a foreign government or otherwise to steal such information.

The defendant must be also punished justly. "A just punishment reflects the seriousness of criminal conduct . . . [and] takes into account the consequences of a defendant's crimes, and their impact on the victims, others, and the community." *United States v. Haughawout*, 502 F. Supp. 3d 1234, 1238 (N.D. Ohio Nov. 23, 2020). The defendant abused the extraordinary trust placed in him by dozens of people representing a large multi-million dollar U.S company. By defendant's own admission, he exploited that trust.

A just punishment must account for the effect of the defendant's duplicity on the victim company. That effect is severe. The government anticipates that the victim company will make a statement to this Court concerning the seriousness of the defendant's conduct, the effect it had on the trust they placed in him, and the defendant's decision to exploit that trust.

### 3. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

There is also a significant need to promote respect for the law and provide adequate deterrence. It is important that the countless employees across the United States who are afforded access to valuable trade secrets know that if they attempt to illegally convert those trade secrets for their own gain or the gain of a foreign country, there will be serious consequences. Indeed, it is critical to U.S. economic security that theft of trade secrets on behalf of a foreign country be discouraged in no uncertain terms. This is especially true given the difficulty of detecting the theft of trade secrets and economic espionage, crimes frequently committed by extraordinarily intelligent people entrusted with tremendous responsibility – like the defendant. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based

13

crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotations omitted). In fact, deterrence by the prospect of punishment is critical to reducing the incidence of crimes like these. *See United States v. Courtney*, 76 F. Supp. 3d 1267, 1306 (D.N.M. Dec. 15, 2014)  ("[C]rimes like this one are difficult to detect with speed or certainty, and, thus, punishment must be stepped up to effectuate general deterrence.").

The defendant's admission makes clear that he suspected that he could be prosecuted. While still employed at the victim company, the defendant conducted Google searches on his work computer to include: "company information to the third party;" "as evidence to accuse me;" "can use it to against me in future;" "I don't want it to be an evidence;" and "to be a piece of evidence that."  As described above, the defendant received extensive training regarding the need to protect proprietary information and, specifically, trade secrets.  The Court has ample evidence to support the conclusion that the defendant knew he was committing a crime and that he could be caught and prosecuted.  And yet he was undeterred.  Fortunately, he was caught. But the painful reality is that but for TCC and Monsanto's alert and prompt action, the defendant's crimes may never have been discovered, let alone prosecuted.  A significant sentence is critical to achieve adequate deterrence in this matter.  A sentence sufficient to deter other offenders is essential to address the grave threat that crimes like the defendant's pose to companies that do business in the U.S. and to this country's economic security generally.

The Court should impose a sentence of between 28 and 37 months so that the sophisticated and highly educated people, trusted by their employers with information of incredible value, who are right now performing the same mental calculus the defendant performed in 2017, reach a different conclusion and are deterred.  *See Courtney*, 76 F. Supp. 3d

at 1306 ("Furthermore, offenders who commit crimes like this one are more sophisticated than most criminal defendants and thus more likely to be aware of the magnitude of their potential criminal exposure."). There is no doubt that they are paying attention to this Court's actions.

4. **The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

After being convicted of conspiracy to commit economic espionage, it is unlikely that future United States-based employers would ever trust the defendant with sensitive or proprietary information. Furthermore, the defendant is not a U.S. citizen and has been convicted of a serious felony. It is likely he will eventually be removed to the PRC following his sentence.

5. **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A primary tool for avoiding sentencing disparities is, of course, the Sentencing Guidelines. While the defendant's applicable Guidelines range is quite low because intended loss is extremely difficult to quantify (10 to 16 months imprisonment), the government submits that a sentence in the range of 28 to 37 months will avoid unwarranted sentencing disparities.

## SENTENCING RECOMENDATION

Economic espionage is an extremely serious offense. Here, the Guidelines underrepresent the seriousness of the offense. As the PSR noted in paragraph 95:

> the offense level determined under USSG §2B.1 substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted. USSG §2B.1, Application Note 21(A). Also, a departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense. USSG §5K2.5. In this case, the defendant's conduct is a serious offense where the defendant, who had a comprehensive understanding of his duty of confidentiality to his employer, sought to benefit himself and the PRC and CAS and may not be adequately captured in the guideline calculation as there is no

15

Offense Level increase for intended loss or gain. (Doc. 138 at 18)

In assessing the amount or degree of any potential variance, the Court could consider the previously described USSG calculations concerning alternative loss theories. That would result in a low end of guidelines of 18 months and a high end of the guidelines of 37 months of imprisonment. The defendant has been in custody for approximately 28 months.

After considering all the evidence, and in light of the above analysis of the relevant sentencing factors, the United States recommends the Court vary from the advisory Guidelines and impose a sentence of imprisonment between 28 and 37 months. The United States submits that such a sentence would be sufficient but not greater than necessary to comply with the provisions of 18 U.S.C. § 3553(a)(2).

>	Respectfully submitted,
>
>	SAYLER A. FLEMING
>	United States Attorney
>
>	/s/*Matthew T. Drake*
>	MATTHEW T. DRAKE, #46499MO
>
>	/s/*Gwendolyn E. Carroll*
>	GWENDOLYN E. CARROLL, #4657003NY
>	Assistant United States Attorneys
>	111 South Tenth Street, 20th Floor
>	Saint Louis, Missouri 63102
>	(314) 539-2200

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 30, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties and counsel of record.

*s/Matthew T. Drake*
MATTHEW T. DRAKE, #46499MO

*s/Gwendolyn E. Carroll*
GWENDOLYN E. CARROLL, #4657003NY