```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
 2
    UNITED STATES OF AMERICA,
 3
         Plaintiff,
 4
         vs.                    Cause No. 4:19CR-00980 HEA
 5
    HAITAO XIANG,
 6
         Defendant.
 7  ===============================================================
                      SENTENCING HEARING
 8
             BEFORE THE HONORABLE HENRY E. AUTREY
 9                UNITED STATES DISTRICT JUDGE
                  -- VIA VIDEO CONFERENCE --
10
                         APRIL 7, 2022
11  ===============================================================

12                          APPEARANCES

13  For Plaintiff:

14  Mr. Matthew T. Drake
    U.S. ATTORNEY'S OFFICE
15  111 South 10th Street
    St. Louis, MO 63102
16
    For Defendant:
17
    Mr. Vadim A. Glozman
18  LAW OFFICES OF VADIM GLOZMAN
    53 W. Jackson, Suite 1410
19  Chicago, IL 60604

20  Appearances Continued on the Next Page:

21

22                         Reported by:

23        Alison M. Garagnani, CCR #475, CSR, RMR, CRR
                   Official Court Reporter
24            United States District Court
               555 Independence, Room 3100
25              Cape Girardeau, MO 63703
                    (573) 331-8832
```

1                    APPEARANCES CONTINUED

2

3      For Bayer US, LLC:

4      Mr. Matthew P. Diehr
       HUSCH BLACKWELL, LLP - St. Louis
       190 Carondelet Plaza
5      Suite 600
       St. Louis, MO 63105

6

7      For the Climate Corporation:

8      Mr. Matthew P. Diehr
       HUSCH BLACKWELL, LLP - St. Louis
9      190 Carondelet Plaza
       Suite 600
10     St. Louis, MO 63105

11

12      Interpreter:

13     May Huang

14

15

16

17

18

19

20

21

22

23

24

25

1              (THE PROCEEDINGS BEGAN AT 10:06 A.M.)

2    (THE FOLLOWING PROCEEDINGS WERE HELD VIA VIDEO CONFERENCE

3    WITH THE DEFENDANT PRESENT VIA VIDEO:)

4              THE CLERK:  All right.  Good morning, Judge.   I

5    have a couple of announcements.  We have some callers on the

6    line, so I'll go ahead and make my first announcement.

7              So all those on the zoom call pursuant to Local

8    Rule 13.02 all means of photographing, recording,

9    broadcasting and televising are prohibited in this court.

10             And, Judge, the Defendant has requested not to use

11   the interpreter at this time.

12             THE COURT:  Okay.  Have you already sworn in the

13   interpreter anyway?

14             THE CLERK:  I have not.

15             THE COURT:  Why don't we just do that anyway to be

16   on the safe side.

17             THE CLERK:  Ms. May.

18             THE INTERPRETER:  Yes.

19             THE CLERK:  If you can raise please your right

20   hand.

21             (Interpreter Sworn in by the Clerk.)

22             THE CLERK:  Thank you.

23             THE COURT:  Thank you.

24             This is the matter of the United States of America

25   versus Haitao Xiang.  The Case Number is 4:19-CR-000980 HEA.

1    We're before the Court for purposes of sentencing at this

2    time.  Has the Defendant pled guilty in this matter?

3              THE DEFENDANT:  Yes.

4              THE COURT:  That was on January 6th, 2022.

5    Sentencing was deferred pending the receipt of the

6    presentencing investigation report, which the Court has now

7    received and reviewed.

8              Let the record further reflect that the Defendant

9    appears with counsel Mr. Vadim Glozman.  The United States

10   appears through Mr. Matt Drake.

11             This matter is proceeding by video consistent with

12   the letter and spirit of the CARES Act as it relates to

13   certain criminal proceedings as well as being consistent with

14   the court order issued by Judge Sippel, Chief Judge of the

15   Eastern District of Missouri, that allows for continuing

16   operations of the Court during these pandemic circumstances.

17             Mr. Glozman, on behalf of the Defendant are you

18   ready to proceed?

19             MR. GLOZMAN:  The defense is ready, Your Honor.

20             THE COURT:  Do you have any objections to

21   proceeding by video?

22             MR. GLOZMAN:  No objections.

23             THE COURT:  Have you had the opportunity to review

24   the presentence investigation report with your client?

25             MR. GLOZMAN:  I have, Your Honor.

1          THE COURT:  And are there any objections to the

2     report as a result of your meeting with your client?

3          MR. GLOZMAN:  Yes, Your Honor.   We have several

4     objections that we were able to work through with the

5     probation office.   There are three outstanding objections.

6     One is regarding a statement contained in Paragraph 31 in the

7     presentence report.

8          The second objection is a special condition of

9     supervision that's contained in Paragraph 103.

10          And the third and probable significant one is the

11     objection to the restitution that is being sought in this

12     matter.

13          THE COURT:  All right.  So let's go over those

14     objections, and we'll start with Paragraph 31.

15          MR. GLOZMAN:  Your Honor, what the objection to

16     this is that Paragraph 31 states that, quote, "By stealing

17     and utilizing Monsanto's trade secret, Xiang would have

18     eliminated Monsanto's exclusive access to their proprietary

19     information which would reduce Monsanto's international

20     market value."

21          Now, this is a statement that's saying it would

22     have done this when there is absolutely no evidence to

23     support this just as there's no evidence to warrant any loss

24     in this case.  This is complete speculation based on nothing.

25          In the final PSR addendum the probation officer in

1    the final part of this paragraph says won't -- if it could

2    have affected it, but, again, that's just conjecture based on

3    nothing.   The PSR is supposed to be based on facts and the

4    law, and there's supposed to be factual objections.  This is

5    kind of speculation by what could have happened if this was

6    successful.  And it's just inappropriate to have such

7    definitive language in this thing if it would have occurred

8    as it says.

9            THE COURT:  Mr. Drake, what say you?

10           MR. DRAKE:  Well, thank you, Your Honor.   The

11   Government's position, Judge, is that the PSR in that

12   statement in Paragraph 31 is accurate.   It is certainly true

13   that by Dr. Xiang -- Defendant's theft of Monsanto's trade

14   secret he certainly deprived them of their exclusive access

15   to their proprietary information, so that statement is

16   factually true.  By taking the trade secret he did profit off

17   of their exclusivity to their proprietary information.

18           To the defense's point about the market share it is

19   true that the Government does not have proof that Monsanto's

20   market share has been impacted or reduced.   However, I think

21   it is -- it is accurate to say that by depriving them of the

22   exclusive access and control over their property Monsanto's

23   market share could be impacted in some negative way.  And

24   we've addressed that in the response that we filed, Judge,

25   with the Court in response to the Defendant's objections.

1        In other words, if the PRC, the People's Republic

2   of China, could have gotten use of this product, it certainly

3   could deprive Monsanto of that marketplace in the future

4   should they ever go into China.  It could also deprive them

5   of the ability to market their product and be international

6   players in the future if the PRC, the People's Republic of

7   China, were to market it on the international marketplace.

8        And even if they did none of those things, Judge,

9   and they just developed the trade secret in their own

10  country, it can reduce the United States agricultural

11  producers' ability to sell to that country in the future.

12  Now, I realize, and I think the defense makes a good point,

13  that a lot of that is speculative and could and may, but I do

14  think that by the theft of the trade secret there is value

15  and truth to the fact that it could affect Monsanto's market

16  value in the future.   I think that the PSR is accurate to

17  that point.

18        THE COURT:  Mr. Glozman.

19        MR. GLOZMAN:  Well, the PSR says that it wasn't a

20  factor which is definitive, and, again, Mr. Drake is saying

21  all of these things that could and may have happened, and we

22  can talk for days about what could or may happen based on

23  nothing beside speculation.

24        If Your Honor wants to consider that with 3553(a),

25  you, of course, are entitled to do that, but I think as far

1    as the PSR goes for the fact of it saying something could

2    happen is not a fact.  It's just speculation.

3              THE COURT:  Anything else?

4              MR. GLOZMAN:  No.

5              MR. DRAKE:  No.

6              THE COURT:  All right.  As to this objection

7    referencing Paragraph 31 of the presentence investigative

8    report, the arguments presented by counsel on the record as

9    well as those noted as a matter of record either by filings

10   or motions the motion is overruled and denied.  The

11   conclusions that were set out in Paragraph 31 are entirely

12   correct and appropriate and consistent with the guidelines

13   and the notes.

14             And we're moving on to Paragraph 103.

15             MR. GLOZMAN:  Your Honor, with that we'll just --

16   we'll rest on our submission as to believing that it's not

17   warranted in this --

18             THE COURT:  Okay.

19             MR. GLOZMAN:  -- on the basis of the Fourth

20   Amendment and pertaining to what actually happened here.

21             THE COURT:  Any response further other than the

22   response that you have already filed, Mr. Drake?

23             MR. DRAKE:  Well, just briefly, Your Honor.  This

24   is a pretty routine condition that is used in this district

25   as the Court is well aware.

1          THE COURT:  Uh-huh.

2          MR. DRAKE:  Dr. Xiang in this instance stole a

3     piece of information, he took it to his home, and he later

4     put it on electronic devices that he was trying to remove

5     from the country.  A search -- a condition related to

6     searching a residence or electronics with reasonable grounds

7     is I think particularly appropriate given the manner in which

8     the crime was committed, Judge.

9          THE COURT:  Yeah.   So the objection regarding

10    Paragraph 103 is overruled and denied.   Mr. Drake is

11    entirely accurate with respect to that being a standard

12    condition of supervision in this district, and especially

13    under the circumstances such as this regarding the use of

14    technology and inappropriate use.

15         Restitution amount, Mr. Glozman.

16         MR. GLOZMAN:  Your Honor, I think there's two major

17    issues here with the restitution amount.   And before I get

18    to them I think first the statute says, perhaps, to be an

19    actual loss for there to be the -- under the MVRA there has

20    to be actual loss, and there is no actual loss in this case.

21    Everyone agrees to that.

22         And also there's a 60-day notice requirement and

23    which was completely ignored in this case.  We were not given

24    the notice until last -- late last week, so procedurally it's

25    completely improper.

1          But when we get down to the actual number -- and

2     I'm just going to say $150,000, and it's approximate -- what

3     we don't know here is if this money was necessary.  And it

4     certainly -- we don't have sufficient evidence establishing

5     how they got to that money.  I know the Government has filed

6     a response yesterday saying, well, he needed Monsanto's help,

7     you know, to find this, this and this, and that's all fine,

8     but what we don't know is why it was necessary for them to

9     use the services of the whole law firm to do this.

10          The law firm didn't have information that the

11    Government would seek.  And, you know, I've worked with

12    Mr. Drake and Ms. Carroll for a year and a half now, and

13    they're very able attorneys.  And I'm sure that the attorneys

14    at Husch Blackwell are able too, but the Government didn't

15    need their help in, you know, researching the law for this or

16    drafting documents.

17          They pretty much acted as an intermediary between

18    Monsanto and the Government.  And why Monsanto couldn't just

19    talk to the Government directly and get the information they

20    needed we don't know.

21          So if they wanted to hire attorneys to protect

22    their rights, that's completely up to them to do, and, you

23    know, maybe they should have done that, but that doesn't mean

24    it's a necessary expense that has to do with this case.

25          And even, you know, we cited Justice Kavanaugh in

1    the submission thing using these attorneys is not necessary

2    for this sort of prosecution.  Sure Monsanto got themselves a

3    safeguard, but what does Husch Blackwell do?  And half of the

4    things I remember them doing here is they're showing up for

5    detention hearings and status hearings and sitting in the

6    hard seats for the motion to suppress hearing.  And if

7    they're billing for any of that, how in the world is that

8    necessary?  It's not.   And there has to be a burden here

9    meeting the necessary expenses.

10          And if Monsanto's participation was necessary,

11   fine, but we have nothing about what Monsanto's going to turn

12   over that was necessary.  We have them outsourcing work

13   without proof about why they needed them.

14          And then this goes to the sufficiency of what they

15   gave us.  We have a single sheet of paper that says one

16   number, 150,000, that they want back and nothing to show how

17   they got to that 150,000.   There is absolutely nothing in

18   the record saying, Well, this time was spent doing this, and

19   this is why it was necessary.   This time was spent doing

20   this, and this is why it was necessary.

21          We just have one number.   We can't argue about

22   whether it was necessary or not, so even if some of the work

23   was necessary, maybe it wasn't the whole 150,000.  Maybe it

24   was just 25,000.   Maybe it was 50,000.  Maybe it was

25   nothing.   We don't know.

1          Even the Eighth Circuit in 2012 said that it's

2    insufficient to just use a general invoice.   And this is

3    even less than a general invoice.  It's a line that says this

4    is how much money was spent based on, again, no evidence.

5    Nothing to support it.   Nothing to support the

6    reasonableness of everything or the sufficiency of

7    everything.  And to hold Mr. Xiang accountable for something

8    like this is completely contrary to Eighth Circuit and United

9    States Supreme Court law.

10             THE COURT:  Mr. Drake.

11             MR. DRAKE:  Thank you, Your Honor.   Respectfully I

12   disagree with Mr. Glozman on this point, and I think the PSR

13   is accurate.   I'll start off with the premise, Judge, that

14   it is true that Monsanto did elect to hire Husch Blackwell to

15   represent them in this, just them, in their endeavors in this

16   case, and I don't think they should be penalized for seeking

17   the advice of counsel of an attorney in trying to figure out

18   how to navigate a Government investigation and the

19   prosecution here.

20          And the Government did make repeated requests of

21   Monsanto and Climate Corp or Climate as it's known as now to

22   do various things that we wanted to put in our response to

23   investigate loss, a series of loss like R&D or the

24   Defendant's knowledge of what was going on at the company,

25   the marketing things that we have talked about.

1           And because they chose to go through counsel to do

2    that I don't think that they should be penalized for that,

3    Judge.  And, frankly, the Government had to go through

4    counsel, because Monsanto is a corporation is a represent --

5    a person or party to this endeavor.

6           I will also point out that my understanding is, and

7    I'm sure Mr. Wilke can correct me if I'm wrong, but I do know

8    that one number that was originally submitted I think that

9    has been supplemented to the probation office with a further

10   breakdown of how they spent their time.

11          Mr. Diehr, who is on this sentencing hearing by

12   Zoom, Judge, is the attorney that represents Monsanto.   He

13   is from Husch Blackwell if the Court has any questions for

14   him.  The bottom line is that the statute says when it comes

15   to attending proceedings and stuff it specifically includes

16   attendance at proceedings related to this offense meaning

17   those are allowable costs or expenses that can be reimbursed

18   through a restitution judgment.

19          And luckily, Judge, it's very fully briefed out by

20   both parties, but I will say that the Court doesn't have to

21   impose -- I mean, I think it should is the Government's

22   position -- restitution under the Mandatory Restitution Act,

23   but it doesn't have to.   If the Court is inclined to enter

24   an order of restitution, it can do so as a condition of

25   supervised release and without ever reaching this issue.

1           The Court doesn't have to do it by statute if it

2      elects not to.   It can make it just a condition.   And, as

3      the Government points out in its brief, that is not a

4      statutory-based order.   It is a condition of supervision

5      order.

6           And unless the Court has any other questions we'll

7      just rely on our brief and response.

8           THE COURT:  Very well.   Anything else,

9      Mr. Glozman?

10          MR. GLOZMAN:  Yes, Your Honor, Mr. Drake mentioned

11     some supplemental documents that were given to probation, and

12     I've seen them.  I'm not going to go into the detail of them

13     based on the issues I had yesterday, but it doesn't break

14     down anything to say what was done and why it was done.   It

15     adds up hours to get up to something, but it doesn't say why

16     anything was done or why it was necessary.

17          And about going to court proceedings it still has

18     to be necessary for them to go to a proceeding.   This going

19     to a public courtroom and watching something they don't have

20     to watch that's not necessary.   There has to be some kind of

21     proof.

22          And it is their right to get an attorney, but it's

23     not their right to get it reimbursed, not under the law.   And

24     that's why this number that's based on nothing that's

25     provable can't be held liable on Mr. Xiang.

1          THE COURT:  Anything further?

2          MR. GLOZMAN:  No, Your Honor.

3          MR. DRAKE:  Judge, the only thing I would add to

4    mine, Your Honor, is if this is an issue that Mr. Glozman

5    brought up the timing of the submission within the 60 days

6    according to the statute, I will say that 3664(d)(5) says if

7    the Court needs further information or further clarification

8    or further evidence of necessity, it allows the Court to set

9    an abeyance for up to 90 days for a decision on this to ask

10   for further information.  So if it's a matter of not having

11   sufficient information or data, there is a statute that

12   allows for the Court to request further inquiry.

13         THE COURT:  All right.  Well, with that being

14   noted you are correct on that, Mr. Drake, and, Mr. Diehr,

15   that might be a good idea so that the record is clear to

16   submit additions to the Court and further explanations of

17   what went into this and that.

18              So what I would propose to do then is ultimately

19   not impose any monetary restitution at this time, but I will

20   consider whatever anyone wants to submit that is provided to

21   the Court in that sense.

22         MR. GLOZMAN:  Yes, Your Honor.

23         MR. DRAKE:  Yes, Your Honor.

24         THE COURT:  Very good.  So I guess with that we'll

25   show the objections regarding the amount of restitution are

1    under submission at this time subject to additional

2    information to be provided to the Court as previously noted.

3    Okay.   Do you have that, Heather?

4              THE CLERK:  Yes, Judge, I got that.   Thank you.

5              THE COURT:  All right.   Any other objections to be

6    discussed at this time then, Mr. Glozman?

7              MR. GLOZMAN:  No, Your Honor.

8              THE COURT:  Now, the Court -- having heard and

9    considered the objections by counsel to the presentence

10   investigation report the Court will accept the presentence

11   investigation report and its conclusions, and I'll certainly

12   appreciate any additional information being provided on

13   restitution.

14             (PURSUANT TO LOCAL RULE 13.05, A CONFERENCE WAS

15   HELD ON THE RECORD AND PLACED UNDER SEAL, AFTER WHICH THE

16   FOLLOWING PROCEEDINGS CONTINUED IN OPEN COURT:)

17             THE COURT:  Okay.   This portion of the transcript

18   has been sealed.

19             And let me ask you this, sir:  We've been talking

20   quite a while.   In light of the announcement earlier that you

21   did not wish to proceed with an interpreter or did not feel

22   that you needed an interpreter are you satisfied that you

23   have understood everything that we've been discussing here up

24   to this point in time without using or taking advantage of

25   that and the interpreter available to you?

1        THE DEFENDANT:  Yes.  So far I can understand.

2        THE COURT:  Okay.  Very good.  The Court will now

3   conclude that the Total Offense Level applicable to the

4   Defendant is 12.   Your Criminal History Category is a I,

5   which in return gives us a guideline provision range of 10 to

6   16 months and a period of supervised release of 1 to 3 years

7   and a special assessment of $100, and, of course, there is

8   that restitution figure available which has been noted in our

9   discussions, $150,458.  That fee imposition of same is to be

10  determined at a later date.

11       Is there anything else you would like to relate to

12  the Court on this matter on behalf of your client,

13  Mr. Glozman, before the Court imposes its sentence?

14       MR. GLOZMAN:  Yes, Your Honor.  I'd like to make an

15  argument pursuant to 3553(a).

16       THE COURT:  Very well.

17       MR. GLOZMAN:  Your Honor, I filed an extensive

18  memorandum about Mr. Xiang's life, and I'm not going to

19  reargue or at least I'll try not to bring anything up that I

20  talked about.   I did my best, and I hope I did justice to

21  illustrate the person that Mr. Xiang is aside from the

22  charges against him.   That's always hard to do within the

23  confines of a few pages for a person that I've only known for

24  a short period of time during the worst period of his life.

25       And so I had the character letters attached that I

1   know Your Honor read by the people who at some point in their

2   lives were touched one way or another by Mr. Xiang's

3   kindness, and that's the one distinct point between all of

4   them.

5          So a couple of letters are from people who are

6   dumbfounded by the predicament to say the least that Mr.

7   Xiang has found himself in given the abhorrent nature of the

8   charges against him.  Granted, I don't know him as well as

9   they do.  I do wholeheartedly agree with their sentiments,

10  and I've come to see that in him myself.

11         And, as an aside briefly, I experienced something

12  in this case that in my short time of being a lawyer at least

13  I've never seen before.  I had someone reach out to me who is

14  an inmate in the same jail as Mr. Xiang to tell me how much

15  of a wonderful person Mr. Xiang is and how he hopes

16  everything works out for him.  And I know that Mr. Xiang's

17  wife had a similar situation after he was transferred from

18  one county to another, had an inmate reach out and just make

19  sure that everything was okay with Mr. Xiang because the

20  other inmates were praying for him, and you can take that for

21  whatever it is, Your Honor, but I think it speaks volumes of

22  who Mr. Xiang is as a person for people who have their own

23  problems and their own cases specifically to reach out on

24  behalf of another inmate when they have nothing to gain from

25  that other than the fact that he's left a profound mark on

1    them as a person.

2         And so I'm faced with this difficult task of

3    reconciling the obvious rift between the aberrational

4    misconduct for which Mr. Xiang as openly and candidly

5    accepted responsibility for and the greater balance of a

6    lifetime of consideration and commitment to family and

7    friends.

8         And so it is with a great deal of apprehension that

9    I try to do this today not because I lack any confidence in

10   this Court in reaching a sentence that is reasonable and not

11   greater than necessary, but because what has been presented

12   to this Court so far are just Mr. Xiang's actions that I can

13   only describe as being not conforming to his actual

14   character.

15        The truth is that Mr. Xiang is not an evil person.

16   He is not a person that gains any sort of pleasure from the

17   misfortune of others, nor is he a person that lacks the

18   capacity to appreciate the effects of his conduct not only on

19   the people closest to him but on the victim of the

20   transgression.   Instead, there's a slight distinction in his

21   character that doesn't excuse or explain his actions but I

22   think puts it into context.

23        And what the character letters come off as it seems

24   like he has a need to pleasure people and to help them, but I

25   think instead if you look between the lines what he has is an

1    incessant desire not to let people down, not to disappoint

2    them, not to be a disappointment.   And the roots of this

3    personality trait I think can be traced back directly to his

4    childhood when he was raised in an authoritarian household

5    with a father that dictated every aspect of his life from the

6    grades he had to get, the jobs he had to hold to support the

7    family as a child, to the clothes he had to wear, making him

8    wear his sister's clothing so they didn't have to purchase

9    his own clothing.

10           And every time his father felt let down whether it

11   was about the grades he got or a job he had or the friends he

12   had he was abusive.   And his father was so abusive that

13   Mr. Xiang's sister was led to attempt suicide on multiple

14   occasions.

15           And so it is with that that Mr. Xiang learned not

16   to be a disappointment, to do as he's told, to get good

17   grades his entire life, to go to a great college and get a

18   great job that the people in his town only dreamed of

19   getting, to live his father's dream.

20           But when that father's dream was becoming a

21   reality, Mr. Xiang fell in love.   And he fell in love with a

22   woman who would ultimately become his wife and the mother of

23   his child.   But she had other plans.   She had plans to come

24   study in the United States, a country where she wanted to

25   start a family and raise her kids, a country that was the

1    exact opposite of where he grew up.

2         And so Mr. Xiang decided to join her on this

3    journey.   He decided to quit his job and apply for a student

4    visa and come to the University of Illinois where he got his

5    Ph.D. and married his wife.   They had a beautiful child.

6         And the next nine years he started working for

7    Monsanto.   In about 2015 or '16, about 14 years after he came

8    into this country, Mr. Xiang's father started to demand that

9    he come back to China, that they had spent a tremendous

10   amount of money on his education, and it was time for them to

11   reap the benefits of his success.

12        And he didn't want to disappoint his parents.

13   That's what he was taught to do.   That's what his culture

14   taught him to do.   And his dad was sick at the time.   He had

15   cancer.   He has since died.   And his mother has been sick

16   and is dying right now.

17        And he felt compelled to go back and to show them

18   what he could do and to look for opportunities.   And one of

19   these opportunities came when he was contacted by a recruiter

20   for the Hundred Talents Program.   And it was an opportunity

21   where Mr. Xiang could apply the skills and knowledge he had

22   to help them develop something new and something similar to

23   what he knew.

24        And now we're here.   Mr. Xiang never wanted to

25   harm Monsanto.   He never intended for them to lose any money

1    or lose any market share.   He never intended for them to

2    lose any business.   He wanted to leverage his knowledge and

3    his experience in a new endeavor.   That was it.

4         But clearly that was shortsighted because the harm

5    that can and was done is not limited to financial harm but

6    much more to Monsanto, which I'm sure that they will tell you

7    about today.

8         The truth is that there's no one present here today

9    that appreciates the gravity and the seriousness of what

10   Mr. Xiang did more than he does, and I say that to Your Honor

11   unequivocally and wholeheartedly.   A man that has never

12   wanted to disappoint anyone in his life has now found himself

13   in a situation where he did just that.   He disappointed

14   everyone.   He disappointed Monsanto, the company that gave

15   him a chance as an international student to brush off his

16   Ph.D.

17        He disappointed the United States, a country that

18   he called home for nearly two decades.   He disappointed the

19   people in China as they are enraged in him because of

20   accepting responsibility for his actions.   He disappointed

21   his wife who has stood by him by his side through everything.

22   He disappointed his child.   And more importantly he has

23   disappointed himself.

24        If punishment is a goal of sentencing, I can assure

25   you that Mr. Xiang -- the time he has served so far has done

1    its purpose.   He is a shell of his old self, at least the

2    old self I met a year and a half ago when he had already been

3    in custody for nearly a year.   And I can only imagine the

4    difference in the person that he was before he was ever

5    arrested.

6            There is not a shred of hope or optimism left in

7    his body.   And this is not something that he'll ever be able

8    to shake off.   It will follow him for the rest of his life.

9    And he finds himself now in limbo not knowing where he will

10   go, because he's being deported from one country that doesn't

11   want him to another country that no longer wants him either.

12   He feels isolated and wronged.   He does not know when he's

13   going to see his wife again or if he will or his child or his

14   dying mother.

15           If retribution is the goal, that's certainly been

16   achieved.   And if deterrence is a goal, that's certainly been

17   met.   This experience has certainly ensured that Mr. Xiang

18   will never see the inside of a courtroom again.   If there's

19   anything I'm certain of, it's that.

20           And as for general deterrence it's hard to fathom

21   how that hasn't been achieved.   Mr. Xiang has sat in custody

22   for nearly two and a half years not being able to fight his

23   case on bond while being a first-time nonviolent offender.

24   And the time he's spent in custody has now amounted to three

25   times the bottom of the applicable guideline range.   If

1   there is some chance to send a message, this certainly does,

2   Your Honor.

3          And we know the Government's position is that

4   Mr. Xiang brought much of this upon himself.  It remains fair

5   that this describes the last two and a half years of his

6   life.  And so today he's going to find out whether he's

7   completed his time of incarceration or if he is still in the

8   beginning stages of what's to lie ahead.

9          Your Honor, I can't begin to presume the difficulty

10  of what you have to do here today, but I do respectfully ask

11  that you take all these mitigating circumstances into

12  consideration.  There's also others that have previously been

13  brought to your attention.

14         And we ask you to look at not only the face of the

15  allegations against Mr. Xiang but his true character.  What

16  he did is wrong, and he'll be the first person to admit that.

17  But we need to look at the type of person he was during these

18  transgressions and the circumstances that led to his

19  involvement in the decision that he's made.

20         And, as I said, when I first started this all too

21  long presentation, I don't know Mr. Xiang as well as the

22  people that wrote the character letters on his behalf, but I

23  wholeheartedly defer to their sentiments.  I did get to know

24  him fairly well over the last year and a half.  He's a good

25  person, and I see that in him.

1          And if anyone has earned another chance, Your

2     Honor, it's him and the things that he's done over the course

3     of his life prior to his transgressions, prior to him needing

4     to prove to this Court that his character is not what's

5     reflected in the indictment when no one was keeping track but

6     vividly remember what he's done.

7          As someone once said what good is the value of a

8     man's life if not given full measure at his time of need?

9     Well, Your Honor, this is a time of need.   Aside from the

10    instant conviction I would ask that Mr. Xiang's actions be

11    treated with compassion in whatever it may be that Your Honor

12    decides.

13         But, as Mr. Xiang will tell you, whatever sentence,

14    Your Honor, imposes he will deal with it and use it to become

15    a better person, the person that everyone close to him knew

16    him to be.

17         And so I hope, Your Honor, that you take all this

18    into consideration and sentence Mr. Xiang according to the

19    life he has led as lenient of a sentence as you see fit under

20    the law.   Thank you.

21         THE COURT:  Thank you.

22         Mr. Drake, anything on behalf of the United States?

23         MR. DRAKE:  Yes, Your Honor, very briefly.

24         First, Your Honor, I'd like to introduce Ms. Nikki

25    Davis who is on the zoom hearing.  She's a representative of

1   Monsanto, and she is prepared to make a statement on

2   Monsanto's behalf when the Court deems the timing

3   appropriate.  And I won't go into the matters that she has to

4   say, but I would like to address a couple of points.

5        I don't want to belabor or reiterate all of the

6   material that the Government put in its sentencing

7   memorandum, but I do want to make maybe a few points and

8   highlight a couple of things.  When Monsanto and what was

9   then The Climate Corporation now known as Climate hired Dr.

10  Xiang, the Defendant, they did so because they believed in

11  him, and they were going to rely on him, and they trusted

12  him.  And they were going to rely on him to help them develop

13  the very idea that they existed to produce and market, and

14  that is the trade secret.

15       And Mr. Glozman is right Dr. Xiang, the Defendant,

16  disappointed them.  He let them down when he betrayed their

17  trust when he stole the trade secret.  And it wasn't just an

18  isolated thing that happened, Your Honor.  It was -- it was a

19  plan, and it was something that was calculated.

20       And by that I mean he knew what he was doing.  He

21  knew it when he was doing the Google searches to say things

22  like when he was searching for things like "evidence that can

23  be used to accuse me or information of third parties."  He

24  knew what he was doing then when he was trying to figure out

25  how to get away with the crime he was in the process of

1    committing.

2            He also knew it when he was applying to become a

3    recruit for the Hundred Talents program that Mr. Glozman

4    mentioned.  That's a state-sponsored program to exfiltrate

5    other information from other countries such as the United

6    States.

7            And when he was applying for that program, he was

8    describing what he was going to do if he were to get that

9    opportunity in the People's Republic of China.  And he knew

10   it while he was working for his employer, and he knew what he

11   was going to take with him when he left, and that was the

12   trade secret that he ultimately stole.

13           By all accounts, Judge, the PSR points out very

14   clearly Dr. Xiang is a very highly educated, intelligent and

15   smart man, and all of this stuff didn't deter him from

16   stealing what he stole, the Nutritional Optimizer, Judge.

17           You know, I know and the Court is well aware the

18   loss in this case is very difficult to calculate.  And

19   Mr. Glozman is right the Government cannot prove any actual

20   loss.  And the ultimate Total Offense Level that the PSR

21   finds is a Level 12, and the Government has agreed with that.

22           However, given all the Court knows about this case

23   and from the sentencing memorandum I think the Court should

24   recognize, and I urge the Court to recognize that that Total

25   Offense Level of 12 significantly under-represents the

1    seriousness of what happened here.

2           Mr. Xiang pled guilty to a conspiracy to commit

3    economic espionage meaning he stole a trade secret for the

4    benefit of another nation, another country, another state, in

5    this case China.  And a Level 12 just significantly

6    under-represents the gravity of what happened here, Judge.

7           And I would urge the Court to consider what the

8    Government put in its sentencing memorandum, which is to

9    sentence the Defendant somewhere between 28 to 37 months, and

10   we provided reasons in our sentencing memorandum how we came

11   to those conclusions, Judge.

12          So I would ask the Court to vary upward and

13   sentence the Defendant to a term of incarceration that the

14   Court deems appropriate given the circumstances and the

15   consideration of what Mr. Glozman says as well as what the

16   Government has said.

17          And with that, Judge, I will conclude.  And if the

18   Court would at the appropriate opportunity give Ms. Davis an

19   opportunity to speak on behalf of the victim in this case

20   that would be Monsanto, the Government would appreciate that,

21   Judge.

22          THE COURT:  All right.  Now, Ms. Davis, are you

23   there?  Are you there?  The video feed for Ms. Davis it looks

24   like it might be frozen.  She may be frozen.  Why don't you

25   go out and come back in.

```
1           MR. DIEHR:  Your Honor, if I may, this is Matt
2   Diehr.  I am an attorney for --
3           THE COURT:  Yes.
4           MR. DIEHR:  -- Climate, LLC.  We may have lost
5   Ms. Davis' feed.  If she comes back on, certainly I will
6   defer to her.  I can try to summarize, if the Court is so
7   inclined, some of what I believe Ms. Davis would have to say.
8           THE COURT:  Well, hold on, because it looks like
9   they lost the court reporter's feed also, of course.
10          All right.  Oh, no, there she is.  She's there.
11  Now, before you do that, Mr. Diehr, do you have any objection
12  to Mr. Diehr making a statement, Mr. Glozman?
13          MR. GLOZMAN:  Your Honor, there are a bunch of
14  objections I would have to anyone making a statement.
15          THE COURT:  Okay.  Go ahead, Mr. Diehr.
16          MR. DRAKE:  Your Honor, I may be able to reach her.
17  Can I take one moment to try to do so?
18          THE COURT:  Yeah, go ahead.
19          MR. DRAKE:  Okay.  Thank you.
20          MS. DAVIS:  I do apologize.  My connection dropped.
21          THE COURT:  Very good.  Now that everyone can see
22  and hear you can you state your name for the record, please.
23          MS. DAVIS:  Thank you, Judge.  I am Nikki Davis.
24  I'm the Vice President of Operations at Climate, LLC, which
25  is a division of Monsanto Company, which is a subsidiary of
```

1    Bayer Crop Science.

2            THE COURT:  Okay.  Very well.  Go ahead and make

3    your statement, Ms. Davis.

4            MS. DAVIS:  First, I thank the Court for allowing

5    me to speak today on behalf of Climate, and, again, I do

6    apologize for losing my connection.

7            I have listened very carefully to this hearing

8    today and these proceedings.  What I'm here to speak about

9    today is a little bit about the impact of the charges that

10   we're here to discuss that they've had on our company

11   directly, but even more importantly than the company the

12   people that comprise the company.

13           Although we speak about Monsanto Company and

14   Climate as an entity at the end of the day it's a collection

15   of people.  I'm a 20-year veteran of the company where I

16   spent the majority of my career at the company as an

17   intellectual property attorney specializing and partnering in

18   patent trademarks.  Although a few years ago I did lose the

19   business aside, but I still have engaged with IP.

20           And what that history allows me to understand in my

21   prior role as well as my current role is the nature of what

22   our team members, our employees put in to developing any of

23   the technology in the ventures that we have.  Now, when I

24   was a patent attorney for the company, I would follow

25   documents around the globe, and one of the hardest things to

1    do was translate not just the technology but the passion that

2    our team members have for the good that can be done around

3    the world.

4            We are a great employer.  However, we're not the

5    company that pays the highest compensation of all.  We're

6    not the employer that has the best benefits in the world, but

7    we are an employer that people come to because of our

8    purpose.

9            Now, our goal is to help for all, hunger for none.

10   And there are many individuals who work for this company and

11   have worked for our company that say that was the reason they

12   come to work each day, and it's the reason they stay at work.

13   The confirmation of what we are here to deliver it

14   fundamentally changes the world.  It changes the world for

15   the better.

16           There are people who are fed because of what we do.

17   And with that we have our scientists, we have our researches,

18   we have our software engineers who come to this place each

19   and every day with the intent and focus of helping to deliver

20   that purpose of hunger for none.  They bring in ideas that

21   they've had their entire careers.  They have new ideas they

22   want to work on together.

23           And working with the company for 20 years I can

24   tell you especially at Climate, LLC there's no greater place

25   where teamwork and collaboration fosters that innovation.

1    We sit in a very open environment.  I'm in the office today,

2    and I'm in a conference room, because our entire arrangement

3    is set to have open seating so that people can foster

4    together as a team, because we know that is where innovation

5    comes from.  That's where innovation stands.  And that's the

6    fastest way to develop it from a very good idea to something

7    that we can do to turn it into a product that farmers can use

8    to further their mission and purpose of feeding the world.

9           When you look at the type of charges that we have

10   today, it arose from a type of collaboration that is

11   fundamental to delivering what we are here to remember, team

12   members.  They are exactly that, team members.   They rely on

13   each other.  They trust each other.  They share their

14   greatest ideas and thoughts.  They cluster together whether

15   it's virtually or in person to best foster how to turn a

16   really good idea into a great idea.

17          Our development timelines are accelerated by this

18   level of collaboration by this partnership.  When there's a

19   lack of trust, when the culture does not foster that

20   collaboration, when people cannot believe they're all here

21   for the same purpose, that erodes our ability to develop

22   these great inventions that impact what we deliver so

23   tremendously.  It means that people are less willing to

24   share, they're less willing to exchange ideas, they're less

25   willing to sit together in a room or virtually and do the

1    type of collective invention discovery that leads to this

2    development.

3             That extends our development timelines, and that

4    has a real cost.  Yes, there's a financial cost when we

5    extend development timelines.  Where there's a greater cost

6    that means that these items that we are developing they don't

7    get to market as fast.

8             There's also a reverse component of that.  Not all

9    of our ideas are the ideas that we want to proceed on.  And

10   not all of our ideas should be developed.  When people don't

11   work together and talk, we can't come up with a consensus

12   that this is an idea that should not be developed, that we

13   should put this to rest and pivot and pick up another idea

14   that's in the pipeline.

15            We think of ourselves as an entity, and we are.  At

16   the end of the day we are with good people, and we're working

17   for the people built on a common purpose for being here, and

18   that's because we believe that what we're solving, what we're

19   helping the world to address, the hunger that we have.

20   Improving the lives of everyone through better agriculture

21   comes from something that each of us personally believes in,

22   and we believe in the outer source thinking and working on

23   this together.

24            That erodes the trust.  We can't have it.  That

25   erodes our timelines and development, and it really impacts

1   us greatly.  And so, yes, while it may seem to be something

2   that's very contained financially, we can discuss how do we

3   get to that calculation.

4        What I wanted to share today is that beyond the

5   financials there's this other impact, and that does -- it's

6   something that is not seen beyond the files, not seen beyond

7   the paperwork, because that's something that's felt in the

8   halls of our work environment when there is a concern that

9   I'm not able to trust my colleague when I have to question

10  the motives of why are they here and are we all here for a

11  collective purpose.

12       So, while I do appreciate everything that counsel

13  has set forth today, I appreciate even greater the

14  opportunity to share what's inside the walls of our company

15  and how incidents such as this does have a chilling effect on

16  the development.  It does shape the lives of everyone who's

17  working together collectively to drive this purpose.

18       And so with that I say thank you.

19       THE COURT:  Thank you.  Anything else, Mr. Drake?

20       MR. DRAKE:  Nothing for the Government, Your Honor,

21  not at this time.

22       THE COURT:  Mr. Xiang, is there anything you want

23  to say on your own behalf?

24       MR. GLOZMAN:  I'm not sure if he heard you, Your

25  Honor.

1          THE COURT:  Mr. Xiang, can you hear me?  Is there

2     anything you would like to say on your own behalf?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Go right ahead.

5          THE DEFENDANT:  Yes.   Your Honor, I've been

6     feeling shame the past 20 months -- I mean, nine months since

7     I have been arrested.   I am here today for my past and

8     repent my wrongdoings.   So today I want to express my

9     emotions and enter an apology to everyone who has been hurt

10    because of my offense.

11         In particular the first thing I want to apologize

12    is to Monsanto and to the Climate Corporation.   I am

13    extremely sorry to them.  I'm not a bad man to forgive me.

14    But most of all I want to apologize to the Government and the

15    Court of this country.

16         And last I want to apologize to my family who I

17    disgraced.  And, Your Honor, I've been fully surrendering

18    myself to the experience during my incarceration.  I'm not

19    the same person anymore.  I've truly learned my lesson, and

20    the lesson has been deeply imbedded in my bone marrow.

21         I have committed to the rest of my life to cleanse

22    this thing of my myself, this stain on myself.   Your Honor,

23    given a second chance I will do my best not to disappoint

24    anyone anymore.   Okay.   Thank you.   That's all.

25         THE COURT:  Is there any legal cause why sentence

1    should not now be pronounced, Mr. Glozman?

2            MR. GLOZMAN:  No, Your Honor.

3            THE COURT:  Mr. Drake?

4            MR. DRAKE:  No, Your Honor.

5            THE COURT:  No legal cause having been shown why

6    sentence should not now be imposed and allocution having been

7    granted, it will be the order and judgment of the Court

8    pursuant to the Sentencing Reform Act of 1984 and as well as

9    the provisions of 18 U.S.C., Section 3553(a), and as well as

10   the statements and the arguments of counsel on the record

11   here today and as well as there were documents filed by

12   counsel for the Defendant and the United States as to their

13   suggested and proposed positions on sentencing.

14           And the Court under review of all the facts and

15   circumstances of the case and the nature of the charge

16   knowing the nature of this offense and the nature of the

17   facts, the conduct of the Defendant in relation to the charge

18   suggests and demonstrates not exactly what sometimes the

19   guidelines have contemplated in some offenses and don't fully

20   consider and take into account what the real severity of the

21   offense is.

22           The suggested guideline range here is 10 to

23   16 months, I believe, which contemplates in my view an

24   offense or offense conduct which is not merely the same as or

25   as heinous as the offense and the conduct involving the

1    Defendant in this instance.  In short, the number in the

2    guideline range, therefore, was considerably lower than it

3    should be.

4            And for that reason I think it's important to

5    highlight the significance of this offense and why I'm

6    varying upward.  You know, this is not under the rule a

7    profiting crime or white collar crime where someone took

8    $2,000.  It's not a real ruthless crime.  It's not a crime

9    just against a corporation.  The nature of the crime is far

10   more significant than that.

11           The offense is entitled "Conspiracy to Commit

12   Economic Espionage," and that type of offense is far reaching

13   and does far greater harm than just on who the punitive

14   victim is in this case.  Monsanto Climate is the victim of

15   the trade secrets taken.  Those trade secrets affect a far

16   greater group of people.  They affect the nation.  I would

17   go so far to say it's an offense that has global impact in

18   its occurrence.

19           It's not a little crime, so, you know, the

20   Government has suggested that to the Court in their arguments

21   on behalf of the United States in support of that and are

22   significant and reasonable and spot on in relationship with

23   the nature of the offense.

24           So that being stated the Defendant is committed to

25   the Bureau of Prisons for a term of 29 months.

1          Upon release from imprisonment, the Defendant will

2    be placed on supervised release for three years.  If not

3    deported, the Defendant shall report in person to the

4    probation office within 72 hours of release from the custody

5    of the Bureau of Prison in the district to which the

6    Defendant is released.

7          The Court has noted earlier that the Court will

8    hold in abeyance its judgment on restitution so that you can

9    forward any information within 90 days in support of that

10   demanded restitution.

11         The Court will impose a fine of $150,000.  Payments

12   of the fine are to be made to the Clerk of the Court.  The

13   interest requirement for the fine is waived.

14         All criminal monetary penalties are due and payable

15   in full immediately.  The Defendant shall pay all criminal

16   monetary penalties to the Clerk of Court.  And the Defendant

17   shall make a lump sum payment of $150,000 within 60 days of

18   the day of sentencing.

19         Until all criminal monetary penalties are paid in

20   full, the Defendant shall notify the Court and this

21   district's United States Attorney's Office Financial

22   Litigation Unit of any criminal monetary changes in the

23   Defendant's economic circumstances that might affect the

24   Defendant's ability to pay the fine.

25         The Defendant shall notify this District's United

1    States Attorney's Office Financial Litigation Unit of any

2    change of mailing or residence address that occurs while any

3    portion of the criminal monetary penalties remain unpaid.

4           And it's further ordered that the Defendant

5    participate in the Financial Responsibility Program while

6    incarcerated if that is consistent with the Bureau of

7    Prisons' policies.

8           The mandatory conditions of supervision will

9    attach.   The standard conditions of supervision will also

10   attach as well as the special conditions will also be

11   imposed.   And if it's determined that there are costs

12   associated with any of the services provided, the Defendant

13   will pay those costs based on a co-payment fee established by

14   the probation office.

15          And the Defendant must provide the probation

16   officer with access to any requested financial information,

17   and the Defendant will provide information about the shared

18   financial information with the United States Attorney's

19   Office.

20          The Defendant must not incur any credit charges or

21   open additional lines of credit without the approval of the

22   probation officer.

23          The Defendant must apply all monies received from

24   any anticipated and/or unexpected financial gains, including

25   income tax refunds, inheritances or judgments to the

1    outstanding Court-ordered financial obligation.   The

2    Defendant must immediately notify the probation office of the

3    receipt of any indicated monies.

4            If the judgment imposes a financial penalty, then

5    the Defendant must pay the financial penalty in accordance

6    with the Schedule of Payments sheet of the judgment.   The

7    Defendant must also notify the Court of any changes in

8    economic circumstances that would affect his ability to pay

9    this financial penalty.

10           The Defendant must immediately report, continue to

11   report, or surrender to the United States Immigration and

12   Customs Enforcement and follow all of their instructions and

13   reporting requirements until any deportation proceedings are

14   completed.

15           If the Defendant is ordered deported from the

16   United States, the Defendant must remain outside the United

17   States unless legally authorized to re-enter.   If the

18   Defendant re-enters the United States, the Defendant must

19   report to the nearest probation office within 72 hours of his

20   return.

21           The Defendant must submit his person, property,

22   house, residence, vehicle, papers, computers, other

23   electronic communications or data storage devices or media or

24   office to a search conducted by the United States probation

25   officer.   The Defendant must warn any other occupants that

1    the premises may be subject to searches pursuant to this

2    condition.  The probation officer may conduct a search under

3    this condition only when reasonable suspicion exists that the

4    Defendant has violated a condition of supervision and that

5    the areas to be searched contain evidence of the violation.

6          It is further ordered that the Defendant shall pay

7    to the United States a special assessment of $100, which is

8    due immediately.

9          Anything else, Mr. Glozman?

10         MR. GLOZMAN:  No, Your Honor.

11         THE COURT:  Anything else, Mr. Drake?

12         MR. DRAKE:  Very briefly, Your Honor.  Consistent

13   with the plea agreement the Government would move for

14   dismissal of Counts 2 through 8 at this time.

15         And, Your Honor, I would just bring to the Court's

16   attention that there's a forfeiture allegation as part of

17   this and ask that the Court include in its order of judgment

18   that under 21 United States Code, Section 853 that the

19   Defendant has forfeited his right, title and interest in the

20   property that was previously identified in the preliminary

21   order that was issued on March 31st of this year, Judge.  And

22   I can submit to the Court the Government's request for

23   forfeiture language at the conclusion of this proceeding.

24         THE COURT:  Very well.  It will be the further

25   order of the Court on oral application of the United States

1  that Counts 2 through 8 inclusive will be dismissed at this

2  time.

3  And it will be the further order of the Court that

4  it will be included in the final order of the Court that you

5  are required under 21 U.S.C. Section 853 to forfeit all items

6  that are the subject of the initial preliminary order of

7  forfeiture, and that was entered on March 31st of 2022, and

8  you will be provided the specific form of who to send it to.

9  Is that, Mr. Drake, what you indicated?

10  MR. DRAKE:  Yes, Your Honor.  Thank you.

11  THE COURT:  Okay.  Very good.

12  Now, Mr. Xiang, having sentenced you it's now my

13  opportunity to inform you of your right to appeal.  Please

14  listen carefully.  You could have appealed the sentence and

15  judgment in this case, but if you have failed to do that

16  within 14 days of the date of the sentence and judgment -- so

17  that would have been 14 days from today, if you did not file

18  your notice of appeal before the 14 days expired, then you

19  would have given up your right to appeal the sentence and

20  judgment in this case.

21  If you were not able to pay the costs for filing

22  the notice of appeal, you could have requested that the costs

23  be waived, and if the costs were waived, then the Clerk of

24  the Court would have filed a notice of appeal free of charge

25  for you.

1          You would have been able to file your appeal if you

2     believed that the sentence violated the law in some way or

3     was otherwise contrary to the law or if you believe that it

4     was void or voidable on its face for some legal reason.

5          Understand, though, that in light of the language

6     in your plea agreement and put on the record consistent with

7     that in the plea agreement you have given up your right to

8     appeal, and you have preserved your ability to file a

9     petition for a writ of habeas corpus under 28 U.S.C. Section

10    2255, but you are limited to things like ineffective

11    assistance of counsel or prosecutorial misconduct, those two

12    things.

13         Do you understand those things that I've just

14    described to you?

15         MR. GLOZMAN:  Your Honor, if I may interject.  I

16    apologize.  I don't believe we waived our right to appeal.

17         THE COURT:  Oh, I stand corrected then.

18         Do you agree with that, Mr. Drake?

19         MR. DRAKE:  Yes, Judge.  The Defendant did reserve

20    some additional appellate rights that are not typically

21    reserved.  I think it was the right to appeal a sentence

22    outside the guidelines, and I believe there was one other

23    issue.  Oh, the issue of the motion to suppress.

24         THE COURT:  So, yes.  Okay.  That's fine.  I stand

25    corrected.

1          You did preserve your right to appeal in that

2     regard, Mr. Xiang, as to those two things.  I stand corrected

3     on that as well as you have reserved your right to file the

4     petition for habeas corpus as I referred to.

5          Do you understand those things?  Do you understand,

6     Mr. Xiang?

7          THE DEFENDANT:  What?

8          THE COURT:  Do you have any questions about any of

9     those things?

10         THE DEFENDANT:  No, Your Honor.   No.

11         THE COURT:  That being said the Defendant is now

12    remanded to the custody of the U.S. Marshal to begin the

13    service of his sentence forthwith.

14         Good luck to you, sir.  Stay healthy, stay safe,

15    and the same to everyone else.  That will conclude this

16    proceeding.  We're in recess.

17         MR. GLOZMAN:  Thank you, Your Honor.

18         MR. DRAKE:  Thank you, Your Honor.

19         THE COURT:  Thank you all.

20         (PROCEEDINGS CONCLUDED AT 11:09  A.M.)

21

22

23

24

25

C E R T I F I C A T E

I, Alison M. Garagnani, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 45 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated Cape Girardeau, Missouri, this 13th day of May, 2022.


----------------------------------------
/s/Alison M. Garagnani
Alison M. Garagnani, CCR, CSR, RMR.
Official Court Reporter